THE UNITED STATES BANKRUPTCY COURT
THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN RE:

JOHN J. BARTOLETTA

    Debtor.

_____/

Case No.: 12-10633-KRM
Chapter 13

JASON HEMENWAY and EVA HEMENWAY,

    Plaintiffs,

v.

JOHN J. BARTOLETTA,

    Defendant.

_____/

Adv. No. _____

## COMPLAINT OF CREDITORS, JASON HEMENWAY AND EVA HEMENWAY, TO DETERMINE DISCHARGEABILITY OF DEBT

Plaintiffs, JASON HEMENWAY and EVA HEMENWAY ("Hemenways"), by and through their undersigned counsel, and pursuant to Fed. R. Bankr. P. 4007(c), hereby file this Complaint to Determine Dischargeability of a Debt in the case of the above named debtor, JOHN J. BARTOLETTA ("Bartoletta"), and allege:

### GENERAL ALLEGATIONS

1.    On July 11, 2012 (the "Petition Date"), Bartoletta filed a voluntary petition for relief under Title 11, Chapter 13 of the United States Code, case number 12-10633-KRM (hereinafter "bankruptcy case"), in the United States Bankruptcy Court for the Middle District of Florida, Tampa Division. By virtue of the filing, Bartoletta has submitted himself to the jurisdiction and venue of this bankruptcy court.

2.     This adversary proceeding is initiated in accordance with Rule 7003 of the Federal Rules of Bankruptcy Procedure. This is an adversary proceeding to determine the dischargeability of a debt pursuant to 11 U.S.C. §523.

3.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§157, 1334 and 11 U.S.C. §523(a)(2)(A) and (a)(4). This is a core proceeding under 28 U.S.C. §157(b)(2)(I).

4.     Plaintiffs are creditors and parties in interest in the bankruptcy case of Bartoletta because of investments they made that were recommended and sold to them by Bartoletta and others.[1]

## BACKGROUND

5.     Plaintiffs are natural persons residing in Chiefland, Florida.

6.     In October of 2007, the Plaintiffs won the Florida Lottery. They elected to take the lump sum payment of $13,779,762.30 before taxes and lottery related charges.

7.     Prior to winning the lottery, the Plaintiffs had been working class people, performing a number of non-professional jobs.

8.     Prior to winning the lottery, the Plaintiffs had never owned a share of stock, a bond, or any other investment security. They had no pensions, 401(k)s, IRA accounts, or brokerage accounts. They had never been involved in any commodities, futures, or option transactions.

---

[1] Prior to the Petition Date, in March, 2011, Plaintiffs filed a complaint still pending in the United States District Court for the Middle District of Florida, Tampa Division, case number 8:11-CV-597-T-30A-EP (hereinafter "District Court case") setting forth the following five counts:

    (I)  Sale of Securities in Violation of 15 USC §78j and 17 CFR §240.10b-5;
    (II)  Sale of Securities in Violation of Chapter 517.301, Florida Statutes;
    (III)  Breach of Fiduciary Duty;
    (IV)  Fraudulent Misrepresentation; and
    (V)  Negligence

9.      Prior to winning the lottery, the only assets owned by the Plaintiffs were their motor vehicles, their house, and minimal savings in a regular bank account.

10.     Mr. Hemenway graduated from high school, but has no other formal education. Mrs. Hemenway did not graduate from high school. Neither of the Plaintiffs has ever had any training, education, or experience whatsoever in financial matters related to investments.

11.     Plaintiffs were at all times relevant completely unsophisticated and unknowledgeable as to securities and investment matters.

12.     After winning the lottery, the Plaintiffs opened an investment account at Capital City Bank Trust Company.

13.     As part of the process to open the accounts, the Plaintiffs were asked to fill out an Asset Allocation Questionnaire. A true and correct copy of the Questionnaire is attached as Exhibit A.

14.     The Plaintiffs answered Questions 8, 9, and 12 as follows:

**8.      Which of the following statements best describes your attitude toward long-term investing?**

    a.      I am willing to accept the lower returns associated with conservative investments that have minimal chance for loss of principal.

**9.      Which of the following best describes your reaction if the value of portfolio suddenly declined 15%?**

    b.      I invest for long-term growth, but would be concerned about even a temporary decline.

**12.     What factor would you consider most important before choosing an investment?**

    a.      The safety of my investment principal.

3

15.     One of their primary representatives at Capital City Bank Trust was Erick J. Arnett ("Arnett") who was aware of the Plaintiffs' investment objectives, risk tolerance, and their responses to the Asset Allocation Questionnaire (Exhibit A).[2]

16.     Arnett spent considerable time with the Plaintiffs fostering and building a close personal relationship with them.

17.     Due to this close personal relationship, the Plaintiffs placed the utmost trust and confidence in Arnett, who is licensed under both State and Federal securities laws.

18.     The Plaintiffs' investments at Capital City Bank Trust Company were conservative and low risk – which was consistent with the Plaintiffs' investment objectives and risk tolerance.

19.     In early 2009, Arnett began having discussions with Bartoletta about leaving Capital City Bank Trust Company and going to work for the High Street Group, LLC.

20.     High Street Group, LLC is an affiliated company with High Street Capital Management, LLC, and High Street Financial, LLC ("High Street entities"). All three entities are managed, controlled, and primarily owned by John J. Bartoletta.[3]

21.     Arnett began to solicit the Plaintiffs to transfer their accounts to High Street Group and come with him when he left Capital City Bank Trust Company to go to work for High Street Group.

22.     Bartoletta was aware of the Hemenways and encouraged Arnett to solicit the Hemenways to transfer of their accounts to High Street Group.

---

[2] Mr. Arnett is a defendant in the District Court case referenced in footnote 1, *supra*.

[3] High Street Group, LLC, High Street Financial, LLC, and High Street Capital Management, LLC are all defendants in the District Court case referenced in footnote 1, *supra.*

23. With Arnett acting as an agent for Bartoletta and the High Street entities, the following representations were made to the Hemenways regarding their proposed investment with High Street Group:

a. that the investment was safe and low risk;

b. that they would be in the "hedge fund" with at least 8 – 10 other high net worth individuals;

c. that the investment was appropriate for Plaintiffs' particular circumstances; and

d. that the investment was consistent with the Plaintiffs' investment objectives and risk tolerances.

24. Plaintiffs, acting on the advice and representations of Arnett, withdrew $3,000,000 from Capital City Bank Trust Company and purchased two (2) limited partner interests in New Advantage Futures, L.P. ("New Advantage").

25. Plaintiffs paid $1,500,000 each for their limited partnership interests in New Advantage. The combined $3,000,000 investment represented a significant portion of the money they had left from their lottery winnings.

26. The limited partnership interests in New Advantage constitute securities under Federal and Florida law.

27. Attached hereto as Composite Exhibits B and C are Mr. Hemenway's Subscription Agreement and Limited Partner Agreement (Composite Exhibit B) and Mrs. Hemenway's Subscription Agreement and Limited Partner Agreement (Composite Exhibit C). Plaintiffs were provided the Subscription Agreement and Limited Partner Agreement by Arnett on behalf of Bartoletta and the High Street entities the day before Capital City Bank Trust Company received a wire transfer request for $3,000,000.

28. At no time prior to the Plaintiffs' purchase of the limited partnership interests of New Advantage did the Defendant disclose to the Plaintiffs:

a. that New Advantage would be trading in highly speculative and volatile investments;

b. that the New Advantage limited partnership interests were highly sophisticated investments that are not appropriate for unexperienced and untrained individuals;

c. that the New Advantage limited partnership interests carried a high degree risk compared to other more traditional investments such as bonds and equities;

d. that the New Advantage limited partnership interests were inappropriate for the Hemenways;

e. that the New Advantage limited partnership interests were inconsistent with the Plaintiffs' investment objectives and risk tolerance;

f. that New Advantage, and its predecessor fund, had consistently lost money since its inception in 2006;

g. that the other hedge funds run by Defendant similarly had consistently lost money;

h. that New Advantage would charge the limited partners, such as the Hemenways, exorbitant fees and expenses, including significant fees to New Castle Capital Markets, LLC, an entity managed, controlled, and primarily owned by Bartoletta;[4]

i. that based upon the extremely high fees relative to the amount of money in the New Advantage fund, the only way for the Plaintiffs to make money on their investment was for the fund to consistently have double digit rates of return; and

j. that Bartoletta and the High Street entities lacked the skill, experience, and expertise to make money in futures and commodities trading.

29. After investing $3,000,000 in New Advantage, the only further information provided to the Plaintiffs were general monthly statements that were totally devoid of any detail as to the investment choices made in connection with New Advantage.

---

[4] In 2009, New Castle was paid $90,806.00 in brokerage commissions. In 2010, New Castle was paid $214,369.00 as an introducing broker. Plaintiff had no relationship with New Castle.

30.     Plaintiffs' investment constituted substantially all of the monies invested in the New Advantage fund.

31.     The limited partnership interests in New Advantage constitute securities under Federal and Florida law.

32.     As stated in the Limited Partnership Agreements, the General Partner for New Advantage is High Street Capital Management, LLC, which in turn hired High Street Financial, LLC to manage the investment decisions of New Advantage.

33.     Plaintiffs made no investment decisions related to the operations of New Advantage, but instead relied entirely upon Bartoletta. At all times material, Bartoletta was registered as an Investment Adviser Representative for High Street Financial, LLC, a Registered Investment Advisor with the Securities and Exchange Commission.

34.     Bartoletta had a duty to recommend only suitable investments to the Plaintiffs under applicable law and standards governing the securities profession.

35.     Bartoletta had a duty under Federal and State law, as well as the standards governing the securities profession, to disclose all material issues to the Plaintiffs regarding a recommended investment, such as New Advantage. He further had a duty to accurately and truthfully disclose these material issues.

36.     Pursuant to the terms of the Limited Partnership Agreement, High Street Financial, LLC was paid a management fee of 2% per annum, plus 20% of any profits went to High Street Capital Management, LLC. See ¶s 4.04; 6.01 (b) of Composite Exhibits B and C.

37.     Immediately following the Hemenways' investment, the value of the limited partnership interests began to decrease in value. Plaintiffs contacted Bartoletta to inquire about

7

the safeness of their investment and were assured by Defendant that the loss in value was unusual and temporary.

38.     Bartoletta encouraged the Plaintiffs not to liquidate their limited partnership interests.

39.     In 2009, the net investment loss for the New Advantage limited partners (the Plaintiffs) was 10.82%.

40.     Finally, on March 24, 2010, the Plaintiffs faxed to High Street Group, LLC, two letters requesting that their account be transferred back to Capital City Bank Trust Company. True and correct copies of these letters are attached as Exhibit D.

41.     Defendant contacted the Plaintiffs and again reassured them that the decline in value was an anomaly and recommended that they not withdraw from the partnership until at least June of 2010.

42.     From the time period April 1, 2010 to June 30, 2010, the Plaintiffs' limited partnership interests declined approximately $589,072.   During this time, New Advantage engaged in excessive trading designed to generate commissions for New Castle Capital Markets, LLC, an entity managed, controlled, and primarily owned by Bartoletta.

43.     Plaintiffs did not withdraw in April of 2010 because of the recommendations of the Defendant to wait until at least June 30, 2010.

44.     Plaintiffs withdrew from New Advantage on or about June 30, 2010.   In the approximately fourteen months that the Plaintiffs relied upon Defendant's representations, they lost approximately $1,200,000 of their $3,000,000 initial investment – an approximately 40%

loss in fourteen months. During this same time period, the Dow Jones Industrial Average gained approximately 2,012 points, or a gain of approximately 25%.[5]

45.     The New Advantage limited partnership interests were unsuitable for the Plaintiffs, based upon their education, investment experience, risk tolerance and investment objectives.

46.     Bartoletta knew that the New Advantage limited partnership interests were unsuitable but recommended and sold them to the Plaintiffs anyway for his own pecuniary gain.

### Count I – False Pretenses or False Representations (11 U.S.C. § 523(a)(2)(A))

47.     Plaintiffs reallege paragraphs 1 to 45 as if fully stated herein.

48.     The Defendant made false statements of material fact to the Plaintiffs, including but not limited to the following:

  a.     that the investment was safe and low risk;

  b.     that they would be in the "hedge fund" with at least 8 – 10 other high net worth individuals;

  c.     that the investment was appropriate for Plaintiffs particular circumstances; and

  d.     that the investment was consistent with the Plaintiffs' investment objectives and risk tolerances.

49.     Defendant acted at all times with scienter. Defendant placed his own pecuniary interests above the interests of Plaintiffs.

50.     Defendant made omissions including, but not limited to, the following material facts:

  a.     that New Advantage would be trading in highly speculative and volatile investments;

---

[5]  In 2010, the net investment loss for the New Advantage limited partners was 29.75%.

9

      b.     that the New Advantage limited partnership interests were highly sophisticated investments that are not appropriate for unexperienced and untrained individuals;

      c.     that the New Advantage limited partnership interests carried a high degree of risk compared to other more traditional investments such as bonds and equities;

      d.     that the New Advantage limited partnership interests were inappropriate for the Hemenways;

      e.     that the New Advantage limited partnership interests were inconsistent with the Plaintiffs' investment objectives and risk tolerance;

      f.     that New Advantage, and its predecessor fund, had consistently lost money since its inception in 2006;

      g.     that the other hedge funds run by Defendant similarly had consistently lost money;

      h.     that New Advantage would charge the limited partners, such as the Hemenways, exorbitant fees and expenses, including significant fees to New Castle Capital Markets, LLC, an entity managed, controlled, and primarily owned by Bartoletta;

      i.     that based upon the extremely high fees relative to the amount of money in the New Advantage fund, the only way for the Plaintiffs to make money on their investment was for the fund to consistently have double digit rates of return; and

      j.     that Bartoletta and the High Street entities lacked the skill, experience, and expertise to make money in futures and commodities trading.

51. Defendant had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or acted with disregard for the truth in that he failed to disclose true facts, even though such facts were known to him.

52. Defendant's misrepresentations and omissions were made for the purpose of enriching himself at the expense of the Plaintiffs.

53.     In ignorance of the false and misleading nature of the representations and omissions described herein and the deceptive and manipulative devices employed by the Defendant, the Plaintiffs purchased the limited partnership interests in New Advantage in reliance on the advice and recommendation of Defendant.

54.     Plaintiffs justifiably relied upon the representations and omissions of Defendant in purchasing their limited partnership interests in New Advantage.

55.     Plaintiffs would not have purchased the limited partnership interests in New Advantage but for Defendant's misrepresentations and omissions, which proximately caused their loss for which Defendant is indebted to the Plaintiffs.

WHEREFORE, Plaintiffs pray that the Court determine that the debt Defendant owes to the Plaintiffs described herein is nondischargeable, and that the Plaintiffs have such other further relief as is just, including reasonable costs and attorneys' fees.

### Count II – Fraud (11 U.S.C. § 523(a)(2)(A))

56.     Plaintiffs reallege paragraphs 1 to 45 as if fully stated herein.

57.     Defendant made material misrepresentations and omissions to the Plaintiffs in regards to the New Advantage limited partnership interest, as alleged herein.

58.     Defendant knew the above representations were false at the time he made them.

59.     Defendant made the representations and omissions to induce the Plaintiffs to purchase the limited partnership interests in New Advantage.

60.     In reliance on the representations and omissions, the Plaintiffs purchased the limited partnership interests in New Advantage.

61.     Plaintiffs have suffered a loss as a result of Defendant's fraud for which he is indebted to them.

WHEREFORE, Plaintiffs pray that the Court determine that the debt Defendant owes to the Plaintiffs described herein is nondischargeable, and that the Plaintiffs have such other further relief as is just, including reasonable costs and attorneys' fees.

## Count III – Breach of Fiduciary Duty (11 U.S.C. § 523(a)(4))

62.     Plaintiffs reallege paragraphs 1 to 45 as if fully stated herein.

63.     As a licensed investment professional, Defendant owed a fiduciary duty to Plaintiffs.

64.     Plaintiffs placed their trust and confidence in Defendant to recommend investment options that were suitable for them.

65.     Defendant breached his fiduciary duties to the Plaintiffs by making misrepresentations and omissions with regards to New Advantage.

66.     Defendant's breach of his fiduciary duties has caused the Plaintiffs to suffer a loss for which he is indebted to them.

WHEREFORE, Plaintiffs pray that the Court determine that the debt Defendant owes to the Plaintiffs described herein is nondischargeable, and that the Plaintiffs have such other further relief as is just, including reasonable costs and attorneys' fees.

## Count IV – Violation of Federal Securities Laws (11 U.S.C. § 523(a)(19)(A))

67.     Plaintiffs reallege paragraphs 1 to 45 as if fully stated herein.

68.     Defendant violated 15 USC 78j and 17 CFR §240.10b-5.

69.     Defendant made false statements of material fact to the Plaintiffs, including but not limited to the following:

        a.     that the investment was safe and low risk;

12

b.    that they would be in the "hedge fund" with at least 8 – 10 other high net worth individuals;

c.    that the investment was appropriate for Plaintiffs particular circumstances; and

d.    that the investment was consistent with the Plaintiffs' investment objectives and risk tolerances.

70.    Defendant acted at all times with scienter. Defendant placed his own pecuniary interests above the interests of Plaintiffs.

71.    Defendant made omissions including, but not limited to, the following material facts:

a.    that New Advantage would be trading in highly speculative and volatile investments;

b.    that the New Advantage limited partnership interests were highly sophisticated investments that are not appropriate for unexperienced and untrained individuals;

c.    that the New Advantage limited partnership interests carried a high degree of risk compared to other more traditional investments such as bonds and equities;

d.    that the New Advantage limited partnership interests were inappropriate for the Hemenways;

e.    that the New Advantage limited partnership interests were inconsistent with the Plaintiffs' investment objectives and risk tolerance;

f.    that New Advantage, and its predecessor fund, had consistently lost money since its inception in 2006;

g.    that the other hedge funds run by Defendant similarly had consistently lost money;

h.    that New Advantage would charge the limited partners, such as the Hemenways, exorbitant fees and expenses, including significant fees to New Castle Capital Markets, LLC, an entity managed, controlled, and primarily owned by Bartoletta;

      i.    that based upon the extremely high fees relative to the amount of money in the New Advantage fund, the only way for the Plaintiffs to make money on their investment was for the fund to consistently have double digit rates of return; and

      j.    that Bartoletta and the High Street entities lacked the skill, experience, and expertise to make money in futures and commodities trading.

72.    Defendant had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or acted with disregard for the truth in that he failed to disclose true facts, even though such facts were known to him.

73.    Defendant's misrepresentations and omissions were made for the purpose of enriching himself at the expense of the Plaintiffs.

74.    In ignorance of the false and misleading nature of the representations and omissions described herein and the deceptive and manipulative devices employed by Defendant, the Plaintiffs purchased the limited partnership interests in New Advantage in reliance on the advice and recommendation of Defendant.

75.    Plaintiffs justifiably relied upon the representations and omissions of Defendant in purchasing their limited partnership interests in New Advantage.

76.    Plaintiffs would not have purchased the limited partnership interests in New Advantage but for Defendant's misrepresentations and omissions, which proximately caused their loss for which Defendant is indebted to the Plaintiffs.

WHEREFORE, Plaintiffs pray that the Court determine that the debt Defendant owes to the Plaintiffs described herein is nondischargeable, and that the Plaintiffs have such other further relief as is just, including reasonable costs and attorneys' fees.

### Count V – Violation of State Securities Laws (11 U.S.C. § 523(a)(19)(A))

77.    Plaintiffs reallege paragraphs 1 to 45 and 68 to 75 as if fully stated herein.

78.     Defendant violated Section 517.301, Florida Statutes.

79.     Section 517.211 (2) provides as follows:

> Any person purchasing or selling a security in violation of s. 517.301, and
> every director, officer, partner, or agent of or for the purchaser or seller, if
> the director, officer, partner, or agent has personally participated or aided
> in making the sale or purchase, is jointly and severally liable to the person
> selling the security to or purchasing the security from such person in an
> action for rescission, if the plaintiff still owns the security, or for damages,
> if the plaintiff has sold the security.

80.     Defendant Bartoletta personally participated, or aided in making the sale of the

limited partnership interests to the Hemenways.

WHEREFORE, Plaintiffs pray that the Court determine that the debt Defendant owes to

the Plaintiffs described herein is nondischargeable, and that the Plaintiffs have such other further

relief as is just, including reasonable costs and attorneys' fees.

DATED this _____ day of August, 2012.

                                    _____
                                    James M. Donohue
                                    Florida Bar No. 0191819
                                    Ken Abele
                                    Florida Bar No. 254370
                                    Kevin A. Forsthoefel
                                    Florida Bar No. 092382
                                    Ausley & McMullen
                                    123 South Calhoun Street (32301)
                                    Post Office Box 391
                                    Tallahassee, FL 32302
                                    (850)224-9115
                                    Facsimile: (850) 222-7560
                                    jdonohue@ausley.com
                                    kabele@ausley.com
                                    kforsthoefel@ausley.com


                                    ATTORNEYS FOR
                                    JASON HEMENWAY and
                                    EVA HEMENWAY



# Capital City
# Trust Company

| **Asset Allocation Questionnaire** |
|:---:|

Account Name ___JASON + EVA  HEMENWAY___

## I.   INTENT OR PURPOSE

**1.   What is the primary objective for these assets?**
   a.   Support current lifestyle
   b.   Wealth preservation or emergency savings
   c.   Retirement planning/long-term wealth accumulation
   d.   Distribution to heirs/charity

Comments: _____
_____
_____

## II.   TIME HORIZON

**2.   What is the time horizon of this account?**
   a.   0-5 years
   b.   6-10 years
   c.   11-14 years
   d.   15 years or longer

Comments: _____
_____
_____

**3.   Given your investment objectives, when do you expect to begin making withdrawals from this account?**
   a.   0-5 years
   b.   6-10 years
   c.   11-14 years
   d.   15 years or longer

Comments: _____
_____
_____

# EXHIBIT A

4. Once withdrawals begin, over how long a period do you expect the withdrawals to continue from this account?

    a.  Lump sum withdrawal
    b.  1-4 years
    c.  5-9 years
    d.  10-14 years
    (e.)  15 or more years

Comments: _____
_____
_____

## III.  CASH FLOW NEEDS

5. Once distributions begin how much do you plan to withdraw on a monthly basis?

*10,000 or income to mm lf. on the 1st of each mo beg 11/1/07 deposit to CCB Checking # 1109050306*

6. Are you planning any major expenditures greater than 20% of your investment assets?

    a.  Within the next year
    b.  Within the next 5 years
    c.  Within 5 to 10 years
    (d.)  None expected

Comments: _____
_____
_____

## IV.  RISK TOLERANCE

7. Which of the following best describes your previous investing experience?

    (a.)  My investment holdings have been limited to bank accounts, certificates of deposit, and savings bonds. *and real estate*
    b.  I have owned some small stock positions, but most of my assets have been in bank accounts, CD's and bonds.
    c.  A significant portion of my financial assets have been invested in stocks and bonds.
    d.  A significant portion of my financial assets have been invested in stocks and bonds, and I have actively traded my portfolio.

Comments: _____
_____
_____

EXHIBIT A


Capital City Trust Company

8. **Which of the following statements best describes your attitude toward long-term investing?**

    a. I am willing to accept the lower returns associated with conservative investments that have minimal chance for loss of principal.

    b. I am willing to accept some chance for loss, but I prefer the majority of my investments to be in securities with relatively low risk to principal.

    c. I am willing to accept moderate volatility in the value of my investments in order to pursue moderate returns.

    d. I am willing to accept significant volatility in the value of my investments in order to pursue moderately high returns.

    e. I am willing to accept large fluctuations in the value of my investments and substantial risk of loss to principal in seeking maximum returns.

Comments: _____

_____

_____

9. **Which of the following best describes your reaction if the value of your portfolio suddenly declined 15%?**

    a. I would be very concerned because I cannot accept fluctuations in the value of my portfolio.

    b. I invest for long-term growth, but would be concerned about even a temporary decline.

    c. If the amount of income I receive was unaffected, it would not bother me.

    d. I invest for long-term growth and accept temporary fluctuations due to market influences.

Comments: _____

_____

_____

10. **Please specify which of the following best summarizes your attitude regarding investments and inflation.**

    a. My goal is to find an investment that will keep pace with or slightly exceed inflation with a minimal potential for loss in investment value.

    b. My goal is to find an investment that will moderately exceed inflation with a moderate potential for loss in investment value.

    c. My goal is to find an investment that will provide returns which are substantially higher than inflation with a higher potential for loss in investment value.

Comments: _____

_____

_____

EXHIBIT A



11. **Which best describes your attitude toward investment losses?**
   a. I check the prices of my investments at least several times a month so I can sell quickly if they begin to lose money.
   b. Daily losses in the value of my investments make me uncomfortable but do not cause me to immediately sell. If my investments suffer a substantial loss over a full quarter, however, I am likely to sell.
   c. I realize there may be substantial day-to-day changes in the value of my investments. Although I focus on quarterly performance trends I usually wait an entire year before making any changes.
   d. If my investments suffered significant losses over a given year (in a down market), I would continue to follow a consistent, long-term investment plan and maintain my asset mix.

Comments: _____

_____

_____

12. **What factor would you consider most important before choosing an investment?**
   a. The safety of my investment principal
   b. The amount of monthly income the investment will generate
   c. The opportunity for steady growth
   d. How quickly I will be able to increase my wealth

Comments: _____

_____

_____

## V. TAX STATUS

13. **What is your approximate marginal income tax rate?**

   20 %

_____

_____

_____

## VI. OTHER FACTORS

14. **What other factors should be considered when designing a portfolio to meet your specific needs?**

_____

_____

_____

Client Signature *Lia M Hemenway* Date 10 - 26 - 07

Client Signature *Jason M. Hemenway* Date 10 - 26 - 07

# EXHIBIT A

Capital City Trust Company

# NEW ADVANTAGE FUTURES, L.P.

*(a Delaware Limited Partnership)*

## SUBSCRIPTION AGREEMENT

THIS **"SUBSCRIPTION AGREEMENT"** (THE "AGREEMENT") IS SUBMITTED TO YOU ON A CONFIDENTIAL BASIS SOLELY IN CONNECTION WITH YOUR CONSIDERATION OF AN INVESTMENT IN LIMITED PARTNERSHIP INTERESTS IN NEW ADVANTAGE FUTURES, L.P., A DELAWARE LIMITED PARTNERSHIP. DUE TO THE CONFIDENTIAL NATURE OF THIS AGREEMENT, ITS USE FOR ANY OTHER PURPOSE MIGHT INVOLVE SERIOUS LEGAL CONSEQUENCES. CONSEQUENTLY, THIS AGREEMENT MAY NOT BE REPRODUCED IN WHOLE OR IN PART, AND MAY NOT BE DELIVERED TO ANY PERSON (OTHER THAN YOUR FINANCIAL ADVISOR) WITHOUT THE PRIOR WRITTEN CONSENT OF THE GENERAL PARTNER.

SUBSCRIPTION AGREEMENT Copy Number:   **NAF999414**

# EXHIBIT C

## TABLE OF CONTENTS

| ITEM | PAGE |
|------|------|
| REPRESENTATIONS FOR INDIVIDUALS | 2 |
| REPRESENTATIONS FOR PENSION PLANS AND IRAs | 2 |
| REPRESENTATIONS FOR TRUSTS OTHER THAN PENSION PLANS | 3 |
| REPRESENTATIONS FOR CORPORATIONS AND PARTNERSHIPS | 3 |
| SIGNATURE PAGE | 10 |
| CORPORATION (Signature) | 11 |
| PARTNERSHIP (Signature) | 11 |
| TRUST (Signature) | 12 |
| QUALIFIED PENSION PLAN (Signature) | 13 |
| ADDITIONAL REPRESENTATION WITH RESPECT TO INVESTMENT BY AN IRA OR SELF-DIRECTED PENSION PLAN | 14 |
| GENERAL PARTNER ACCEPTANCE | 15 |

# EXHIBIT C

## SUBSCRIPTION AGREEMENT

The undersigned, _Eva M. Hemenway_ (the "New Limited Partner") and New Advantage Futures, L.P., a Delaware Limited Partnership (the "Partnership"), hereby agree as follows:

**FIRST:** The New Limited Partner desires to become a limited partner of the Partnership on: _4 / 1 / 09_ (the "Admission Date"). In accordance with the terms of the Limited Partnership Agreement of the Partnership.

The New Limited Partner will make a Capital Contribution to the Partnership on the Admission Date in the amount set forth below.

$ _1,000,000_
**Capital Contribution**

Name: _Eva M Hemenway_

Address: _8491 NW 136th St._
Number          Street

_Chiefland          FL          32626_
City          State          Zip Code

_USA_
Country

~~Social Security Number~~
**Social Security Number or Federal Identification Number**

The Partnership agrees to admit the New Limited Partner as a limited partner on the Admission Date. The New Limited Partner's Capital Contribution shall be in cash in the form of checks made payable to the Partnership.

**SECOND:** EACH NEW LIMITED PARTNER MUST COMPLETE THE APPROPRIATE REPRESENTATIONS SET FORTH BELOW RELATING TO ITS "ACCREDITED INVESTOR", "QUALIFIED PURCHASER" AND "BENEFIT PLAN INVESTOR" STATUS:

**Accredited Investor Status:**

The New Limited Partner represents that it is an "accredited investor" within the meaning of Regulation D under the U.S. Securities Act of 1933, as amended (the "Securities Act"), and has indicated below each category under which the New Limited Partner qualifies as an accredited investor.

The New Limited Partner is as of the Admission Date:

☐      (i) an individual who had an income in excess of $200,000 in each of the two most recent years (or joint income with his or her spouse in excess of $300,000 in each of those years) and has a reasonable expectation of reaching the same income level in the coming year;

☑      (ii) an individual who has a net worth (or joint net worth with his or her spouse) in excess of $1,000,000;

## EXHIBIT C

☐     (iii) an Individual Retirement Account ("IRA") or revocable trust and the individual who established the IRA or each grantor of the trust is an accredited investor on the basis of (i) or (ii) above;

☐     (iv) a self-directed pension plan and the participant who directed that assets of his or her account be invested in the Partnership is an accredited investor on the basis of (i) or (ii) above and such participant is the only participant whose account is being invested in the Partnership;

☐     (v) a pension plan which is not a self-directed plan and which has total assets in excess of $5,000,000;

☐     (vi) an irrevocable trust which consists of a single trust (a) with total assets in excess of $5,000,000, (b) which was not formed for the specific purpose of investing in the Partnership and (c) whose purchase is directed by a person who has such knowledge and experience in financial and business matters that he or she is capable or evaluating the merits and risks of the prospective investment;

☐     (vii) a corporation, a partnership or a Massachusetts or similar business trust, that was not formed for the specific purpose of acquiring interest in the Partnership, with total assets in excess of $5,000,000;

☐     (viii) an entity in which all of the equity owners are accredited investors; or

☐     (ix) none of the above apply (further information may be required to determine accredited investor status).

**Qualified Purchaser Status:**

The New Limited Partner represents and warrants that it is a "qualified purchaser" within the meaning of Section 2(a)(51) of the Investment Company Act of 1940, as amended ("1940 Act") and has indicated below which category under which the New Limited Partner qualifies as a qualified purchaser. In order to complete the following information, New Limited Partners should refer to the Worksheet annexed to this Subscription Agreement for the definition of "Investments" and for information regarding the valuation of Investments.

The New Limited Partner is as of the Admission Date:

☑     (i) <u>Individual.</u> An individual who owns not less than $5,000,000 in "Investments" (see annexed Worksheet for a definition of "Investments");

☐     (ii) <u>IRA or Self-Directed Pension Plan.</u> An IRA or a self-directed pension plan and the individual who established the IRA or the individual who directed that his or her assets be invested in the Partnership is an individual who owns not less than $5,000,000 in "Investments";

☐     (iii) <u>Family Company.</u> A corporation, partnership or trust that (a) was not formed for the specific purpose of acquiring an interest in the Partnership, (b) will not have more than 40% of its net assets invested in the Partnership, (c) owns not less than $5,000,000 in "Investments" and (d) is owned directly or indirectly by or for two or more natural persons who are related as siblings or spouses (including former spouses), or direct lineal descendants by birth or adoption, spouses or estates of such persons, or foundations, charitable organizations or trusts established by or for the benefit of such persons;

# EXHIBIT C

❑    (iv) <u>Trust</u>. A trust that (a) was not formed for the purpose of acquiring an interest in the Partnership and (b) as to which the trustee or other person authorized to make decisions with respect to the trust, and each settlor or other person who has contributed assets to the trust, is a "qualified purchaser";

❑    (v) <u>Employee Benefit Plan</u>. An employee benefit plan that (a) owns $25,000,000 or more in "Investments" and (b) does not permit its participants to decide whether and how much to invest in particular investment alternatives;

❑    (vi) <u>Private Investment Fund</u>. A corporation, partnership or trust (an "entity") that (a) was not formed for the specific purpose of acquiring an interest in the Partnership, (b) will not have more than 40% of its net assets invested in the Partnership, (c) would be an investment company under the 1940 Act but for the exclusions from investment company status in Section 3(c)(1) or 3(c)(7) thereof, (d) owns not less than $25,000,000 in "Investments" and (e) each pre-April 30, 1996 beneficial owner of which has consented to the treatment of the entity as a "qualified purchaser";

❑    (vii) <u>Entity Generally</u>. An entity, other than a private investment fund (see (vi) above) or employee benefit plan (see (v) above), that (a) was not formed for the specific purpose of investing in the Partnership, (b) will not have more than 40% of its net assets invested in the Partnership, and (c) owns and invests on a discretionary basis, for its own account or for the accounts of qualified purchasers, $25,000,000 or more in "Investments";

❑    (viii) <u>Entity Composed Entirely of Qualified Purchasers</u>. An entity, each beneficial owner of the securities of which is a qualified purchaser;

❑    (ix) <u>Qualified Institutional Buyer</u>. A "qualified institutional buyer" as defined in Rule 144A under the Securities Act, acting for its own account, the account of another qualified institutional buyer, or the account of a qualified purchaser (please refer to special instructions in the Worksheet); or

❑    (x) none of the above apply (further information may be required to determine qualified purchaser status

**Benefit Plan Investor Status:**

In order for the Partnership to accurately monitor its "Benefit Plan Investor" participation, please review the following definition of a "Benefit Plan Investor" and make the appropriate representations by checking all applicable boxes following the definition.

A "Benefit Plan Investor" is (i) any employee benefit plan subject to the fiduciary responsibility provisions of Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), (ii) any individual retirement plan or account subject to the prohibited transaction rules of Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code") or (iii) any entity whose underlying assets include "plan assets" (as defined by ERISA and the regulations thereunder) by reason of a plan's investment in the entity.

The New Limited Partner represents that it is (please check all applicable boxes):

A.  ☐    <u>not</u> a Benefit Plan Investor; or

B.  ☐    a Benefit Plan Investor that is:

# EXHIBIT C

1.  ☐  subject to Part 4 of Title I of ERISA;

2.  ☐  subject to Section 4975 of the Code (that has not checked B1);

3.  ☐  an entity whose underlying assets include "plan assets". The New Limited Partner also represents that the percentage of its "plan assets" compared to the value of its total assets or included in its general account is not more than:

| | | |
|---|---|---|
| ☐ 10% * | ☐ 20% * | ☐ 30% | ☐ 40% |
| ☐ 50% | ☐ 60% | ☐ 70% | ☐ 80% |
| ☐ 90% | ☐ 100%; | | |

( * applicable to entities with multiple classes, one of which exceeds the 25% threshold for Benefit Plan Investors and to U.S. insurance company general accounts)

4.  ☐  a group trust, a bank common or collective trust or an insurance company separate account;

The New Limited Partner further agrees (i) to notify the General Partner 30 days prior to this representation (or any part thereof) no longer being true or likely to become untrue and (ii) to provide the General Partner upon request such information as may be required to confirm and/or refine the representations provided above.

**THIRD:** The New Limited Partner further represents, warrants, acknowledges and agrees that:

(a)  The New Limited Partner (or its Purchaser Representative, if any, who has been designated by it) is entering into this Agreement relying solely on the facts and terms set forth in this Agreement, the Confidential Private Offering Memorandum of the Partnership, as amended from time to time, (the "Memorandum") and the Partnership Agreement and it has received copies of all such documents and the General Partner has not made any representations of any kind or nature to induce the New Limited Partner to enter into this Agreement except as specifically set forth in such documents;

(b)  The New Limited Partner (or such Purchaser Representative) has made an investigation of the pertinent facts relating to the operation of the Partnership and has reviewed the terms of the Partnership Agreement to the extent that it deems necessary in order to be fully informed with respect thereto;

(c)  The New Limited Partner (or such Purchaser Representative) has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of an investment in the Partnership and the New Limited Partner is able to bear the economic risk of a complete loss of its investment in the Partnership;

(d)  The New Limited Partner will be acquiring the limited partnership interest for investment, for its own account and not for the interest of any other person and not for distribution or resale to others, and it will not permit any other person to acquire a beneficial interest in the limited partnership interest (including, without limitation, by pledge, option, swap or nominee or similar relationship) without the consent of the General Partner. It understands that the limited partnership interests have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), and it agrees that its interest in the Partnership may not be sold, transferred or otherwise disposed of except pursuant to an exemption from registration under the Securities Act. It will not assign its interest in the Partnership or any beneficial interest therein, in whole or in part, to any other person, nor

EXHIBIT C

will it be entitled to substitute for itself as a limited partner any other person, except with the written consent of the General Partner in its sole discretion;

(e)    The New Limited Partner understands the effect of the limitations on disposition and of its representation that its interest in the Partnership will not be sold, transferred or otherwise disposed of except pursuant to an exemption from registration under the Securities Act. It understands that transfers can be made only with the consent of the General Partner in its sole discretion;

(f)    No person is acting or authorized to act as its Purchaser Representative in connection with its capital contribution to the Partnership, except the person set forth on the signature page of this Agreement as its Purchaser Representative; and

(g)    The New Limited Partner has carefully reviewed the provisions in the Memorandum under the heading "Brokerage and Custody" relating to the brokerage and "soft dollar" or commission arrangements of the Partnership and specifically consents to the Partnership engaging in such arrangements.

FOURTH: If the New Limited Partner is a corporation, partnership, limited liability company, trust or other entity, it represents that (i) it is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, (ii) the execution, delivery and performance by it of this Subscription Agreement are within its powers and have been duly authorized by all necessary action on its behalf and (iii) the person executing this Agreement and the Limited Partnership Agreement for the New Limited Partner has the full power and authority under the New Limited Partner's governing instruments to do so.

FIFTH: If the New Limited Partner is a corporation, partnership, limited liability company or other entity, the New Limited Partner represents and warrants that (i) it was not formed for the purpose of investing in the Partnership, (ii) based on the most recent valuations available, the New Limited Partner's investment in the Partnership constitutes less than 40% of its net assets and (iii) the New Limited Partner agrees to notify the Partnership promptly if its investment in the Partnership exceeds 40% of its net assets.

SIXTH: If the New Limited Partner is or would be an investment company as defined by the Investment Company Act of 1940, as amended (the "1940 Act"), but for the exceptions contained in Section 3(c)(1) or Section 3(c)(7) of the 1940 Act, it recognizes that the Partnership is restricted by law as to the number of beneficial interests held in the Partnership, and, that in determining the number of beneficial interests, it may be necessary to count the beneficial owners of the New Limited Partner if it owns 10% or more of the Limited Partners' interests in the Partnership. Accordingly, the New Limited Partner agrees to take whatever action is requested by the Partnership to have its interest in the Partnership be less than 10% of the total interests of the Limited Partners and expressly agrees that the General Partner may require the New Limited Partner to withdraw at any time so much of its interest as is necessary to keep such interest below 10%.

SEVENTH: Any New Limited Partner that is investing the assets of a benefit plan or account and the person executing this Agreement or the "Additional Representation with Respect to Investment from an IRA or Self-Directed Pension Plan or by a Directed Trustee" on behalf of such New Limited Partner acknowledge that it is intended that the Partnership will not hold "plan assets" subject to Title I of ERISA or Section 4975 of the Code (i.e., less than 25% of each class of the Partnership's equity interests will be held by Benefit Plan Investors). Accordingly, the New Limited Partner acknowledges that the Partnership has the authority to require the retirement or withdrawal of all or some of the limited partnership interest held by any Benefit Plan Investor if the continued holding of such partnership interest, in the opinion of the General Partner, could result in the Partnership being subject to Title I of ERISA or Section 4975 of the Code. Further, the New Limited Partner and the person executing this Agreement or the "Additional Representation with

EXHIBIT C

Respect to Investment from an IRA or Self-Directed Pension Plan or by a Directed Trustee" represent and warrant to the Partnership and the General Partner that:

(a)     With respect to the investment in the Partnership, it has been determined that the purchase of the limited partnership interest is consistent with the fiduciary responsibilities under applicable law, including ERISA and the Code, and that (i) the investment in the Partnership is prudent, (ii) the structure, operation and incentives of the fee arrangements have been adequately disclosed, (iii) the calculation of the net asset value of a capital account as described in the Limited Partnership Agreement represents the fair market value of the limited partnership interest; (iv) the New Limited Partner's current and anticipated liquidity needs will be met, given the limited rights to redeem or transfer the limited partnership interest, (v) the investment will permit the New Limited Partner's overall portfolio to remain adequately diversified and (vi) the investment and investment program described in the Memorandum are permitted under the laws, rules and documents governing the New Limited Partner.

(b)     The persons executing this Agreement or the "Additional Representation with Respect to Investment from an IRA or Self-Directed Pension Plan or by a Directed Trustee" (i) are responsible for the decision to invest in the Partnership, (ii) in making the decision to invest in the Partnership, have not relied on any advice or recommendation of the Partnership, the General Partner, any placement agent associated with the Partnership, or any of their affiliates with respect to the investment in the Partnership and (iii) are qualified to make such investment decision and, to the extent deemed necessary, have consulted their own investment advisors and legal counsel regarding the investment in the Partnership.

**EIGTH:** The New Limited Partner represents that concurrently with the execution of this Agreement, the New Limited Partner has executed and delivered to the Partnership a counterpart of the Limited Partnership Agreement of the Partnership, to be effective upon the New Limited Partner's admission as a partner in the Partnership.

**NINTH:** (a) The New Limited Partner understands and agrees that the Partnership prohibits the investment of funds by any persons or entities that are acting, directly or indirectly, (i) in contravention of any U.S. or international laws and regulations, including anti-money laundering regulations or conventions, (ii) on behalf of terrorists or terrorist organizations, including those persons or entities that are included on the List of Specially Designated Nationals and Blocked Persons maintained by the U.S. Treasury Department's Office of Foreign Assets Control[7] ("OFAC"), as such list may be amended from time to time, (iii) for a senior foreign political figure, any member of a senior foreign political figure's immediate family or any close associate of a senior foreign political figure[8], unless the General Partner, after being specifically notified by the New Limited Partner in writing that it is such a person, conducts further due diligence, and determines that such investment shall be permitted, or (iv) for a foreign shell bank[9] (such persons or entities in (i) – (iv) are collectively referred to as "Prohibited Persons").

(b)     The New Limited Partner represents, warrants and covenants that: (i) it is not, nor is any person or entity controlling, controlled by or under common control with the New Limited Partner, a Prohibited Person, and (ii) to the extent the New Limited Partner has any beneficial owners[10], (A) it has carried out thorough due diligence to establish the identities of such beneficial owners, (B) based on such due diligence, the New Limited Partner reasonably believes that no such beneficial owners are Prohibited Persons, (C) it holds the evidence of such identities and status and will maintain all such evidence for at least five years from the date of the New Limited Partner's complete withdrawal from the Partnership, and (D) it will make available such information and any additional information that the Partnership may request.

(c)     If any of the foregoing representations, warranties or covenants ceases to be true or if the Partnership no longer reasonably believes that it has satisfactory evidence as to their truth, notwithstanding any other agreement to the contrary, the Partnership may, in accordance with applicable regulations, be obligated to freeze the New Limited Partner's investment, either by prohibiting additional investments, declining or suspending any withdrawal requests and/or segregating the assets constituting the investment, or the New

# EXHIBIT C

Limited Partner's investment may immediately be involuntarily withdrawn by the Partnership, and the Partnership may also be required to report such action and to disclose the New Limited Partner's identity to OFAC or other authority. In the event that the Partnership is required to take any of the foregoing actions, the New Limited Partner understands and agrees that it shall have no claim against the Partnership, the General Partner and their respective affiliates, directors, members, partners, shareholders, officers, employees and agents for any form of damages as a result of any of the aforementioned actions.

(d)     The New Limited Partner understands and agrees that any withdrawal proceeds paid to it will be paid to the same account from which the New Limited Partner's investment in the Partnership was originally remitted, unless the General Partner, in its sole discretion, agrees otherwise.

TENTH:  The New Limited Partner agrees to indemnify and hold harmless the Partnership, the General Partner and their respective directors, members, partners, shareholders, officers, employees, agents and affiliates from and against any and all losses, liabilities, damages, penalties, costs, fees and expenses (including legal fees and disbursements) that may result, directly or indirectly, from any inaccuracy in or breach of any representation, warranty, covenant or agreement set forth in this Agreement or in any other document delivered by the New Limited Partner to the Partnership.

ELEVENTH:  The New Limited Partner recognizes that non-public information concerning the New Limited Partner set forth in this Agreement or otherwise disclosed by the New Limited Partner to the Partnership, or other agents of the Partnership, such as the New Limited Partner's name, address, social security number, assets and income, and information regarding the New Limited Partner's investment in the Partnership (collectively, the "Information") (i) may be disclosed to the Partnership's General Partner, attorneys, accountants and auditors in furtherance of the Partnership's business and to other service providers such as brokers who may have a need for the Information in connection with providing services to the Partnership, (ii) to third party service providers or financial institutions who may be providing marketing services to the Partnership provided that such persons must agree to protect the confidentiality of the Information and use the Information only for the purposes of providing services to the Partnership, and (iii) as otherwise required or permitted by law.  The Partnership and General Partner restrict access to the Information to their employees who need to know the Information to provide services to the Partnership, and maintain physical, electronic and procedural safeguards that comply with U.S. federal standards to guard the Information.

TWELFTH:     **Electronic Delivery of Reports and Other Communications.  The Partnership and/or the General Partner or the Management Company or the Administrator acting on their behalf may provide the New Limited Partner (or its designated agents) with statements, reports and other communications relating** to the Partnership and/or the New Limited Partner's investment in the Partnership (such as subscription and withdrawal activity, annual and other updates of the Partnership's consumer privacy policies and procedures) (collectively, the "Partnership Information") in electronic form, such as e-mail, in lieu of or in addition to sending such communications as hard copies via fax or mail.  E-mail messages are not secure and may contain computer viruses or other defects, may not be accurately replicated on other systems, or may be intercepted, deleted or interfered with without the knowledge of the sender or the intended recipient.  The Partnership, the General Partner, the Management Company and the Administrator make no warranties in relation to these matters.  The Partnership, the General Partner, the Management Company and the Administrator reserve the right to intercept, monitor and retain e-mail messages to and from its systems as permitted by applicable law.  If the New Limited Partner has any doubts about the authenticity of an e-mail purportedly sent by the Partnership, the General Partner, the Management Company or the Administrator, the New Limited Partner is required to contact the purported sender immediately.  The General Partner's acceptance of your subscription is not conditioned on your giving consent to electronic delivery of Partnership Information.  If you do not have access to the internet or e-mail, you should not consent to electronic delivery of Partnership Information.  You may revoke your consent to electronic delivery of Partnership Information at any time upon written notice to the Partnership and receive all Partnership Information in paper format.

EXHIBIT C

Please check the appropriate box:

☐     The New Limited Partner hereby agrees to receive Partnership Information in electronic form in lieu of or in addition to separate mailing of paper copies.

☑     The New Limited Partner declines to receive Partnership Information in electronic form in lieu of or in addition to separate mailing of paper copies.

**THIRTEENTH:** The New Limited Partner hereby acknowledges that the New Limited Partner has received (not less than 48 hours prior to executing this Agreement) and had an opportunity to review the Form ADV, Part II of High Street Financial LLC, the Management Company of the Partnership.

**FOURTEENTH:** The New Limited Partner hereby agrees that (i) any representation made hereunder will be deemed to be reaffirmed by it at any time it makes an additional capital contribution to the Partnership and such additional contribution will be evidence of such reaffirmation, and (ii) if any of the statements, representations, warranties or covenants made herein become untrue or inaccurate, the undersigned shall immediately notify the Partnership.

**FIFTEENTH:** This Agreement shall inure to the benefit of and be binding upon each of the parties hereto, his or her heirs and legal representatives. This Agreement may be executed in counterparts, all of which when taken together shall be deemed one original.

SPECIAL NOTICE TO GEORGIA INVESTORS: THE LIMITED PARTNERSHIP INTERESTS WILL BE SOLD IN RELIANCE ON THE EXEMPTION FROM SECURITIES REGISTRATION CONTAINED IN PARAGRAPH 13 OF CODE SECTION 10-5-9 OF THE GEORGIA SECURITIES ACT OF 1973, AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT FROM SUCH ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SUCH ACT.

# EXHIBIT C

## SIGNATURE PAGE

IN WITNESS WHEREOF, the undersigned have hereunto signed this SUBSCRIPTION AGREEMENT as of the date written below.

**GENERAL PARTNER**

High Street Capital Management, LLC
By: High Street Group, L.L.C.
 Managing Member

By: _____

Date of Signature: __3__ / __24__ / __09__

**LIMITED PARTNER**

**INDIVIDUAL (Signature)**

_Eva M. Hemenway_____
Print Name of Limited Partner

X_____
Signature of Limited Partner or Authorized Signatory

_____
Title of Authorized Signatory

Date of Signature: __3__ / __24__ / __09__

X_____
Signature (Secondary if needed)

Date of Signature: _____ / _____ / _____

SUBSCRIPTION AGREEMENT       10       NEW ADVANTAGE FUTURES, L.P.

# EXHIBIT C

**CORPORATION (Signature)**

_____
Print Name of Limited Partner

X _____
Signature of Limited Partner or Authorized Signatory **Officer(s)**

_____
Title of Authorized Signatory **Officer(s)**

**Date of Signature:** _____ / _____ / _____

████████████████████████████████████████████████

**PARTNERSHIP (Signature)**

_____
Print Name of Limited Partner 1

X _____
Signature of Limited Partner 2 or Authorized Signatory **Partner(s)**

_____
Title of Authorized Signatory **Partner(s)**

**Date of Signature:** _____ / _____ / _____

_____
Print Name of Limited Partner 2

X _____
Signature of Limited Partner 2 or Authorized Signatory **Partner(s)**

_____
Title of Authorized Signatory **Partner(s)**

**Date of Signature:** _____ / _____ / _____

████████████████████████████████████████████████

EXHIBIT C

**TRUST (Signature)**

_____
Print Name of Limited Partner

X _____
Signature of Limited Partner or Authorized Signatory **Trustee(s)**[1]

_____
Title of Authorized Signatory **Trustee(s)**

**Date of Signature:** _____ / _____ / _____

█████████████████████████████████████████████

X _____
Signature (Additional Trustee if needed)

Date of Signature: _____ / _____ / _____

X _____
Signature (Additional Trustee if needed)

Date of Signature: _____ / _____ / _____

X _____
Signature (Additional Trustee if needed)

Date of Signature: _____ / _____ / _____

X _____
Signature (Additional Trustee if needed)

Date of Signature: _____ / _____ / _____

_____

[1] If the New Limited Partner is a self-directed pension plan or this Agreement is being executed by a directed trustee, the trustee of the New Limited Partner executes this Agreement and the fiduciary who directed the pension plan's investment in the Partnership is required to execute the representation on the page following the Custodian Signature.

EXHIBIT C

**CUSTODIAN ACCOUNT (Signature)**

_____
Print Name of Limited Partner

X _____
Signature of Limited Partner or Authorized Signatory **Custodian**[2]

_____
Title of Authorized Signatory **Custodian)**

**Date of Signature:** _____ / _____ / _____

---

[2] If the New Limited Partner is an IRA, the custodian of the New Limited Partner executes this Agreement and the fiduciary who directed the IRA's investment in the Partnership is required to execute the representation on the next page.



### ADDITIONAL REPRESENTATION WITH RESPECT TO INVESTMENT FROM AN IRA OR SELF-DIRECTED PENSION PLAN OR BY A DIRECTED TRUSTEE

If the New Limited Partner is an IRA or a self-directed pension plan or this Agreement is being executed by a directed trustee, the Individual who established the IRA or the person who directed the pension plan's investment in the Partnership, as the case may be: (i) has directed the custodian or trustee of the New Limited Partner to execute this Agreement on the line set forth above for Authorized Signatory; (ii) has exclusive authority with respect to the decision to invest in the Partnership; and (iii) has signed below to indicate that he or she has reviewed, directed and certifies to the accuracy of the representation and warranties made by the New Limited Partner herein.

_____
Print Name of Limited Partner

X _____
Signature

**Date of Signature:** _____ / _____ / _____

**INFORMATION OF CUSTODIAN**

Name of Custodian      _____

Address:      _____
              Number                Street
              _____
              City            State            Zip Code
              _____
              Country

Account or Reference Number: _____

Custodian's Tax I.D.Number:      _____

SUBSCRIPTION AGREEMENT                14                NEW ADVANTAGE FUTURES, L.P.


EXHIBIT C

## GENERAL PARTNER ACCEPTANCE

ON BEHALF of New Advantage Futures, L.P., the undersigned hereby accepts this executed SUBSCRIPTION AGREEMENT.

**GENERAL PARTNER**

High Street Capital Management, LLC
By: High Street Group, L.L.C.
    Managing Member

By: _____

Date of Signature: __3__ / __26__ / __09__

EXHIBIT C

WORKSHEET

Determination of "Investments" for
Purposes of Section SECOND of the Subscription Agreement

When determining ownership in "Investments" the following general rules are applicable:

1.    Investments should be valued at either their fair market value as of the most recent practicable date or at cost.

2.    Investments include investments held jointly with the New Limited Partner's spouse.

3.    Investments include investments held in any IRA, 401(k) or similar retirement account directed by the New Limited Partner and held for the New Limited Partner's benefit.

4.    There must be <u>excluded</u> from the value of each Investment the principal amount of any outstanding debt, including margin loans, incurred by the New Limited Partner (or any of the owners of the New Limited Partner) to acquire or for the purpose of acquiring the Investment.

5.    Investments include the following:

    (A)    securities which are publicly-traded and listed on a U.S. national securities exchange or traded on NASDAQ;

    (B)    shares in registered investment companies such as mutual funds and money market funds;

    (C)    interests in private investment companies such as hedge funds, commodity pools and similar private investment companies (such as the Partnership);

    (D)    cash and cash equivalents (including foreign currencies) held for investment purposes;

    (E)    real estate held for investment purposes; and

    (F)    shares of non-public companies which have total shareholder equity of $50 million or more.

6.    Investments <u>**DO NOT**</u> include the following:

    (A)    jewelry, artwork, antiques and collectibles;

    (B)    investments held in retirement accounts where the New Limited Partner does <u>not</u> make the investment decisions (e.g., an employer retirement plan where the investment decisions are not directed by the New Limited Partner); and

    (C)    shares in a non-public company in which the New Limited Partner has a controlling interest (presumed to exist if the New Limited Partner owns more than 25% of the voting interests).

EXHIBIT C

7. Special instructions for a New Limited Partner that is a qualified purchaser based on its status as a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act. In order to be a qualified purchaser if the New Limited Partner is a dealer as described in paragraph (a)(1)(ii) of Rule 144A, the New Limited Partner must own and invest on a discretionary basis at least $25 million in securities of issuers that are not affiliated persons of the dealer. In addition, a plan referred to in paragraph (a)(1)(D) or (a)(1)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(F) of Rule 144A that holds the assets of such a plan will not be deemed to be acting for its own account and, accordingly, will not be deemed to be a qualified purchaser on the basis of "qualified institutional buyer" status if investment decisions with respect to the plan are made by beneficiaries of the plan, except with respect to investment decisions made solely by the fiduciary, trustee or sponsor of such plan.

# EXHIBIT C

# NEW ADVANTAGE FUTURES, L.P.

*(a Delaware Limited Partnership)*

## LIMITED PARTNERSHIP AGREEMENT

### January 2009

THIS "**LIMITED PARTNERSHIP AGREEMENT**" IS SUBMITTED TO YOU ON A CONFIDENTIAL BASIS SOLELY IN CONNECTION WITH YOUR CONSIDERATION OF AN INVESTMENT IN LIMITED PARTNERSHIP INTERESTS IN NEW ADVANTAGE FUTURES, L.P., A DELAWARE LIMITED PARTNERSHIP AS STATED IN THE CONFIDENTIAL PRIVATE OFFERING MEMORANDUM. DUE TO THE CONFIDENTIAL NATURE OF THIS LIMITED PARTNERSHIP AGREEMENT, ITS USE FOR ANY OTHER PURPOSE MIGHT INVOLVE SERIOUS LEGAL CONSEQUENCES. CONSEQUENTLY, THIS LIMITED PARTNERSHIP AGREEMENT MAY NOT BE REPRODUCED IN WHOLE OR IN PART, AND MAY NOT BE DELIVERED TO ANY PERSON WITHOUT THE PRIOR WRITTEN CONSENT OF THE GENERAL PARTNER.

LIMITED PARTNERSHIP AGREEMENT Copy Number:   **NAF999414**

# EXHIBIT C

## TABLE OF CONTENTS

ITEM        PAGE

ARTICLE I   General Provisions ................................................................................................ 2

ARTICLE II   Admissions .......................................................................................................... 3

ARTICLE III   Management of Partnership ................................................................................ 3

ARTICLE IV   Expenses of the Partnership, Overhead Expenses, Organizational Expenses
      and Management Fee ........................................................................................ 5

ARTICLE V   Capital Accounts and Capital Contributions .................................................... 5

ARTICLE VI   Allocation of Net Profits and Net Losses .......................................................... 6

ARTICLE VII   Allocation of Income for Tax Purposes ........................................................... 7

ARTICLE VIII   Withdrawals from Capital Accounts and Retirements ..................................... 8

ARTICLE IX   Term and Dissolution of the Partnership ......................................................... 9

ARTICLE X   Payments to and by a Person Who Has Ceased to be a Partner ................... 11

ARTICLE XI   Miscellaneous Provisions ............................................................................... 11

SIGNATURE PAGE .......................................................................................................... 14

GENERAL PARTNER ACCEPTANCE ............................................................................... 15

EXHIBIT C

# LIMITED PARTNERSHIP AGREEMENT

AGREEMENT OF LIMITED PARTNERSHIP, amended and restated, as of January 1, 2009, by and among High Street Capital Management, LLC, a Delaware limited liability company, as General Partner (the "General Partner") and all the parties who sign copies of this agreement to become Limited Partners (herein called the "Limited Partners"). (The General Partner and the persons who sign as Limited Partners are sometimes collectively referred to as the "Partners"). Whenever the masculine or feminine gender is used in this Agreement, it will equally, where the context permits, include the other, as well as include entities.

## ARTICLE I

### General Provisions

Section 1.01    Formation. The original parties hereto hereby form New Advantage Futures, L.P. as a limited partnership (the "Partnership") pursuant to the provisions of the Delaware Revised Uniform Limited Partnership Act (the "Act"). The existence of the Partnership commenced upon the filing with the Secretary of State of Delaware of a Certificate of Limited Partnership in accordance with the provisions of such law.

Section 1.02    Partnership Name. The name of the Partnership is New Advantage Futures, L.P.

Section 1.03    Purpose. The purpose of the Partnership is to serve as a fund through which the assets of its Partners will be utilized to invest, hold and trade in future contracts, commodities and other financial instruments and rights and options relating thereto.

Section 1.04    Registered Office and Agent for Service of Process. The registered office of the Partnership is 1209 Orange Street, Wilmington, Delaware 19801, and the registered agent for service of process at such office is The Corporation Trust Company.

Section 1.05    Place of Business. The principal place of business of the Partnership shall be 12802 Tampa Oaks Boulevard, Suite 405, Tampa, Florida 33637-1915.

Section 1.06    Fiscal Year and Fiscal Periods. The fiscal year of the Partnership will end on December 31 each year, subject to change by the General Partner from time to time. A new fiscal period ("Fiscal Period") will commence on the first day of each fiscal quarter, on each date of any capital contribution to the Partnership and on each date next following the date of any withdrawal of capital or retirement from the Partnership, and the prior Fiscal Period will end on the date immediately preceding such date of commencement of a new Fiscal Period.

Section 1.07    Liability of Limited Partners. Except as expressly provided in the Delaware Revised Uniform Limited Partnership Act, the Limited Partners will not be liable for any liabilities, or for the payment of any debts and obligations, of the Partnership.

Section 1.08    Assignability of Limited Partnership Interest. The limited partnership interest of a Limited Partner in the Partnership or any beneficial interest therein may not be assigned, in whole or in part, except with the written consent thereto of the General Partner given in its sole discretion. Upon such an assignment of a limited partnership interest, the assignee will become a Limited Partner upon the execution of such agreements and other documents as the General Partner will require.



EXHIBIT C

## ARTICLE II

### Admissions

Section 2.01 <u>Admission of Partners</u>. With the consent of the General Partner, additional Limited Partners may be admitted to the Partnership on the first day of each month and at such other times as the General Partner will, in its sole discretion, permit. In connection with the admission of a Partner to the Partnership, such Partner will, in advance of such admission and as a condition thereto, sign a copy of this Agreement or a supplement hereto pursuant to which he agrees to be bound by the terms of this Agreement. The General Partner may admit additional or substitute general partners (i) as of the first day of any calendar year upon 45 days' prior written notice to all Limited Partners, (ii) at any time with the consent of the majority in interest of the Limited Partners or (iii) at any time if such additional or substitute general partners are affiliates of the General Partner or the Management Company (defined in Section 3.02), or are entities controlled by John J. Bartoletta, the managing members of the General Partner, without any notice to or consent of the Limited Partners.

## ARTICLE III

### Management of Partnership

Section 3.01 <u>Management of the Partnership</u>. The General Partner will manage the Partnership, which shall have the discretion of making investments on behalf of the Partnership and of exercising the powers set forth in Section 3.02. The General Partner may appoint such agents of the Partnership as it deems necessary who will hold such offices and shall, under the direction of the General Partner, exercise such powers of the General Partner in the management of the Partnership and perform such duties in connection therewith as the General Partner shall determine from time to time. The General Partner will devote so much of its time and efforts to the affairs of the Partnership as may, in its judgment, be necessary to accomplish the purposes of the Partnership. Nothing herein contained will prevent the General Partner, Management Company (as defined below) and their respective affiliates, principals, members and employees or any other Partner from conducting any other business, including any business within the securities industry; whether or not such business is in competition with the Partnership. Without limiting the generality of the foregoing, the General Partner, the Management Company and their respective affiliates, principals, members and employees may act as the investment adviser or the investment manager for others, may manage funds or capital for others, may have, make and maintain investments in their name or through other entities, and may serve as officers, directors, consultants, partners or stockholders of one or more investment funds, partnerships, securities firms or advisory firms.

Section 3.02 <u>Powers of the General Partner</u>. The General Partner will have the following powers to exercise on behalf of the Partnership in accordance with Section 3.01:

(a) To purchase, hold, sell and otherwise deal in commodities, commodity contracts, commodity futures, financial futures and options in respect thereof, including restricted investments, on margin or otherwise;

(b) To write, purchase, hold, sell and otherwise deal in put and call options of any sort and in any combination thereof;

(c) To purchase, hold, sell and otherwise deal in currencies, forwards, partnership interests, interests in other investment companies and any other financial instruments that exist now or are hereafter created;

(d) To conduct margin accounts with brokers; to open, maintain and close bank accounts and draw checks or other orders for the payment of moneys; to pledge


EXHIBIT C

investments for loans, and to effect borrowings from brokers, banks and other financial institutions;

(e)     To enter into, make and perform any other contracts, agreements or other undertakings it may deem advisable in conducting the business of the Partnership, including but not limited to contracts, agreements or other undertakings with persons, firms or corporations with which the General Partner or any other Partner is affiliated;

(f)     To appoint High Street Financial, LLC, to serve as the management company of the Partnership (the "Management Company") to be responsible for investment decisions and certain administrative services;

(g)     To retain a third party administrator whose expenses will be paid by the Partnership; and

(h)     To act for the Partnership in all other matters.

Section 3.03     Limitation of Liability; Indemnification.

(a)     Neither the General Partner, nor any person or persons designated pursuant to Sections 9.02, will be liable for any loss or cost arising out of, or in connection with, any act or activity undertaken (or omitted to be undertaken) in fulfillment of any obligation or responsibility under this Agreement, including any such loss sustained by reason of any investment or the sale or retention of any security or other asset of the Partnership, except that any person exculpated from liability under this Section will not be exculpated from any liability arising from losses caused by his, her or its gross negligence, willful misconduct or violations of applicable law.

(b)     The General Partner, the Management Company, and their respective principals, members, officers, agents, affiliates and employees, and each person designated pursuant to Section 9.02 (each an "Indemnitee") shall be indemnified and held harmless by the Partnership to the fullest extent legally permissible under and by virtue of the laws of the State of Delaware, as amended from time to time and U.S. securities laws, from and against any loss, liability and expense (including, without limitation, judgments, fines, amounts paid or to be paid in settlement and reasonable attorneys' fees and expenses) incurred or suffered by an Indemnitee in connection with the good faith performance by  an Indemnitee of its responsibilities to the Partnership; provided, however, that an Indemnitee shall not be indemnified for any liability arising from losses caused by its gross negligence, willful misconduct or violations of applicable law.  The Partnership shall, in the discretion of the General Partner, advance amounts and/or pay expenses as incurred in connection with the indemnification obligation herein.  In the event this indemnification obligation shall be deemed to be unenforceable, whether in whole or in part, such unenforceable portion shall be stricken or modified so as to give effect to this paragraph to the fullest extent permitted by law.  The indemnification provided in this Section shall in no event cause any Limited Partner to incur any liability beyond the limited liability provided in Section 1.07.

EXHIBIT C

## ARTICLE IV

### Expenses of the Partnership, Overhead Expenses, Organizational Expenses and Management Fee

Section 4.01  Expenses of the Partnership.  The General Partner shall be authorized to incur and pay in the name and on behalf of the Partnership all expenses that it deems necessary or desirable.

Section 4.02  Overhead Expenses. The Management Company will be responsible for and will pay all overhead expenses of an ordinary and recurring nature such as rent, supplies, secretarial expenses, stationery, charges for furniture and fixtures, employee insurance, payroll taxes and compensation of employees.  All other expenses will be borne by the Partnership including legal, accounting, auditing, and other professional expenses, administrator fees and expenses, research expenses, investment expenses such as commissions, custodial fees, bank service fees and other expenses related to the purchase, sale or transmittal of Partnership assets.

Section 4.03  Organizational Expenses.  The Partnership will pay its organizational expenses, including expenses incurred in connection with the initial offer and sale of interests in the Partnership ("Organizational Expenses").  The Partnership has borne and is amortizing its Organizational Expenses over a period of 60 months from the date the Partnership commenced operations because the Partnership believes that such treatment is more equitable than expensing the entire amount of Organizational Expenses when incurred, as is required by generally accepted accounting principles ("GAAP").

Section 4.04  Management Fee.  The Partnership shall pay the Management Company a quarterly management fee in advance calculated at the rate of 2.0% per annum of the net assets of the Partnership (the "Management Fee").  The Management Fee shall be payable promptly after the first day of each calendar quarter based on the value of the net assets of the Partnership as of the first day of such quarter.  The Management Fee shall be prorated for periods less than a full quarter.  If a Limited Partner makes additional contributions to the Partnership during a quarter, the General Partner shall prorate the Management Fee and charge it to such Limited Partner at the time of such contribution.  The General Partner, in its sole discretion, may waive or reduce the Management Fee for Limited Partners that are principals, employees or affiliates of the General Partner or the Management Company, relatives of such persons, and for certain strategic investors.

## ARTICLE V

### Capital Accounts and Capital Contributions

Section 5.01  Capital Accounts.  A Partner's "Capital Account" as of a particular date will consist of the following:

(a)  An amount equal to his original capital contribution;

(b)  The additions, if any, to such account by reason of capital contributions made on or before such date; and

(c)  The adjustments, if any, to such account in accordance with the provisions of Sections 4.04, 5.03 and 11.01 and Article VI.

Section 5.02  Capital Contributions.  The Partnership will accept only cash contributions to the capital of the Partnership.

EXHIBIT C

Section 5.03 <u>Certain Adjustments to Capital Accounts</u>. The amount of withdrawals, if any, made by a Partner will be deducted from such Partner's Capital Account as of the date of such withdrawal.

Section 5.04 <u>Additional Contributions to Capital</u>. A Partner may make additional contributions to the capital of the Partnership on the first day of each calendar quarter and at such other times as the General Partner shall, in its sole discretion, permit.

## ARTICLE VI

### Allocation of Net Profits and Net Losses; Determination of Net Profits and Net Losses

Section 6.01 <u>Allocation of Net Profits and Net Losses.</u>

(a) Any Net Profits or Net Losses (as defined in Section 6.02) during any Fiscal Period shall be allocated as of the end of such Fiscal Period to the Capital Accounts of all the Partners in the proportions that each Partner's Capital Account as of the beginning of such Fiscal Period bore to the aggregate of the Capital Accounts of all the Partners as of the beginning of such Fiscal Period.

(b) If in any fiscal quarter ("Current Quarter") the Net Profits allocated to the Capital Account of a particular Limited Partner pursuant to Sections 6.01 exceed the Net Losses so allocated to the Capital Account of such Limited Partner, 20% of the Net Profits will be reallocated to the Capital Account of the General Partner at the end of the Current Quarter (the "Incentive Allocation"); provided, however, that no Incentive Allocation with respect to a particular Limited Partner will be made until the Net Profits for the Current Quarter exceed such Limited Partner's loss carryforward amount applicable to the Current Quarter. The loss carryforward amount for a particular Limited Partner applicable to the Current Quarter shall be the sum of all prior quarter Net Losses allocated to the Limited Partner that have not been subsequently offset by prior quarter Net Profits; provided, however, that the loss carryforward amount will be reduced proportionately to reflect any withdrawals made by such Limited Partner. The General Partner, in its sole discretion may, waive or reduce the Incentive Allocation for Limited Partners that are principals, employees or affiliates of the General Partner or the Management Company, relatives of such persons, and for certain strategic investors.

(c) Notwithstanding that the Incentive Allocation shall be reallocated to the General Partner at the end of any fiscal quarter, in the event that a Limited Partner redeems or withdraws or is required to retire at any time other than the end of a fiscal quarter or in the General Partner's sole discretion, the General Partner shall be entitled to the Incentive Allocation, with respect to such Limited Partner, on the applicable withdrawal or retirement date.

Section 6.02 <u>Determination of Net Profits and Net Losses</u>. "Net Profits" or "Net Losses" of the Partnership for a Fiscal Period will be determined on the accrual basis of accounting using GAAP as a guideline and further in accordance with the following.

(a) Net Profits and Net Losses shall include realized and unrealized profits and losses with respect to all investments. In computing such realized and unrealized profits and losses, profit and loss will mean for each position held in a security during any Fiscal Period, the realized or unrealized appreciation or realized or unrealized depreciation, as the case may be, with respect to such position, determined by comparing the net proceeds from the closing of such position or the market value of such position at the end of such Fiscal Period with (i) the cost of such position if established during such Fiscal Period or, (ii) if such position was established during a prior Fiscal Period, the market value of such position at the end of the last preceding

EXHIBIT A

Fiscal Period. Investments contributed to the Partnership shall be treated as if purchased by the Partnership at market value on the date of contribution and investments distributed from the Partnership shall be treated as if sold by the Partnership at market value on the date of distribution.

(b)　　The market value of a commodity future, financial future, forward or other similar contract shall be the most recent available closing quotation on such exchange; provided, however, that if the General Partner determines that such closing price does not accurately reflect the market value due to price limit constraints, such contract shall be valued at fair market value as determined by the General Partner, provided that such valuation is based on independent pricing sources.

(c)　　The General Partner will determine the manner of valuing all other assets and liabilities of the Partnership, provided that such valuation is based on independent pricing sources.

(d)　　There will be deducted in computing Net Profits and Net Losses estimated expenses for legal and audit services and other expenses, if any, in respect of the particular Fiscal Period (whether performed therein or to be performed thereafter), and such reserves for contingent liabilities of the Partnership, including estimated expenses, if any, in connection therewith, as the General Partner shall determine. The Management Fee shall be deducted in computing Net Profits and Net Losses; however, overhead expenses borne by the Management Company pursuant to Section 4.02 will not be deducted in computing Net Profits and Net Losses.

(e)　　The Organizational Expenses of the Partnership are being amortized over a period of 60 months from the date the Partnership commenced operations, and the amortizable portion of the Organizational Expenses may be deducted in computing Net Profits and Net Losses.

## ARTICLE VII

### Allocation of Income for Tax Purposes

Section 7.01　　Ordinary Deductions and Ordinary Income. For Federal income tax purposes, all items of deduction other than losses from the sale or deemed sale of investments, and all items of income other than gains from the sale or deemed sale of investments, shall be allocated, as nearly as is practicable, in accordance with the manner in which such items of deduction or income affected the amounts that were either deducted from or added to the Capital Accounts of the Partners.

Section 7.02　　Gains and Losses on Contributed Securities. For Federal income tax purposes, gains and losses from the sale or deemed sale of investments recognized by the Partnership on the disposition of investments contributed by a Partner to the capital of the Partnership will be allocated in accordance with the provisions of Section 704(c) of the Internal Revenue Code of 1986, as amended.

Section 7.03　　Other Gains and Losses. Except as provided in Section 7.02, for Federal income tax purposes, gains and losses from the sale or deemed sale of investments shall be allocated, as nearly as is practicable, in accordance with the manner in which the increase or decrease in the value of the investments giving rise to such gains or losses was added to or deducted from the Capital Accounts of the Partners. The Partnership may, but is not required to, use an aggregate approach in making such allocations.

Section 7.04　　Allocation of Gains and Losses to Retiring Partners. Notwithstanding Section 7.03 above, in the event a Partner retires from the Partnership (including mandatory withdrawals

EXHIBIT C

under Section 8.04), the General Partner, in its sole discretion, may make a special allocation to said Partner for Federal income tax purposes of the gains or losses, as the case may be, recognized by the Partnership in such a manner as will reduce the amount of the difference, if any, of such Partner's Liquidating Share (as defined in Section 10.01) and his Federal income tax basis in his interest in the Partnership before such allocation.

Section 7.05    Death of a Partner. If a Partner dies on a day other than the last day of a Fiscal Period, all items of income, gain, loss or deduction for such Fiscal Period allocable to such Partner pursuant to this Article VII shall be allocated to such Partner for Federal income tax purposes based on a fraction, the numerator of which shall be the number of days (including the date of death) that the Partner was alive during such Fiscal Period, and the denominator of which is the total number of days in such Fiscal Period. The balance of such items allocable to such Partner for such Fiscal Period shall be allocated to the deceased Partner's estate. Each Partner agrees on behalf of the Partner and the Partner's estate that any executor or other fiduciary filing any tax returns on their behalf will treat this allocation as effecting a termination of the taxable year of the Partnership for Federal income tax purposes in order to determine their respective shares of such items for any applicable reporting period.

## ARTICLE VIII

### Withdrawals from Capital Accounts and Retirements

Section 8.01    Permissible Withdrawals. A Partner may withdraw all or any part of its Capital Account (as defined in Section 5.01) in the manner and to the extent provided in Section 8.02.

Section 8.02    Withdrawal Procedure.

(a)    Upon giving at least 30 days' prior written notice to the General Partner, a Limited Partner may withdraw all or any part of its Capital Account as of the end of each fiscal quarter; provided, however, that a Limited Partner may not withdraw any part of its Capital Account attributable to a particular capital contribution until at least twelve months after such contribution was made to the Partnership. Any Limited Partner desiring to make a withdrawal from its Capital Account shall give written notice to the Partnership of (i) such Limited Partner's intention to make such withdrawal and (ii) the amount thereof or the basis upon which such amount is to be determined. Notwithstanding the foregoing, the General Partner, in its sole discretion, may waive or modify any terms related to withdrawals for Limited Partners that are principals, employees or affiliates of the General Partner or the Management Company, relatives of such persons, and for certain strategic investors.

(b)    The General Partner may withdraw all or any part of its Capital Account as of the last day of each fiscal quarter; provided that if the amount so proposed to be withdrawn by the General Partner would be in excess of the initial capital contribution of the General Partner to the Partnership, the General Partner shall, not less than 45 days before such date, notify the other Partners of (i) its intention to make such withdrawal and (ii) the amount thereof or the manner in which the amount thereof is to be determined. Notwithstanding the foregoing, the General Partner will not make a withdrawal if doing so would reduce its capital account balance below the lesser of $100,000 or 1% of the total capital of the Partnership.

(c)    A Partner withdrawing its entire Capital Account pursuant to this Section 8.02 will be deemed to have retired as of the date of such withdrawal. Limited Partners who make partial withdrawals will be paid as promptly as practicable, generally within 30 days.

Section 8.03    Payment on Retirement. Retirement of a Partner, whether by (a) withdrawal of such Partner's entire Capital Account, or (b) action of the General Partner under Section 8.04, will be subject to the provisions of Article X.

EXHIBIT C

Section 8.04    Mandatory Withdrawals.  The General Partner, in its sole discretion, may require any Limited Partner to withdraw all or any part of its Capital Account from the Partnership at any time on not less than 20 days' notice, such withdrawal to be effective on the date specified in such notice.  If the General Partner, in its sole discretion, deems it to be in the best interests of the Partnership to do so because the continued participation of any Limited Partner in the Partnership might cause the Partnership to violate any law, rule or regulation or expose the Partnership to the risk of litigation, arbitration, administrative proceedings or any similar action or proceeding, the General Partner may require such Limited Partner to withdraw all or any part of its Capital Account from the Partnership at any time on not less than 5 days' notice, such withdrawal to be effective on the date specified in such notice.  A Limited Partner who is so required to retire pursuant to this Section 8.04 will be entitled to receive the value of his Liquidating Share (as defined in Section 10.01) computed as of the date on which such Limited Partner's retirement will become effective.

Section 8.05    Distributions in Cash or in Kind.  All distributions to a Partner by reason of the Partner's withdrawal or retirement from the Partnership (including required retirements under Section 8.04) shall be made in cash or, in the sole discretion of the General Partner, in investments or partly in cash and partly in investments selected by the General Partner.  In-kind distributions may be made directly to the withdrawing Partner or, alternatively, in certain limited circumstances, distributed into a liquidating trust or account and sold for the benefit of such Partner, in which case (i) payment to such partner of that portion of his withdrawal attributable to such investments will be delayed until such time as such investments can be liquidated and (ii) the amount otherwise due such partner will be increased or decreased to reflect the performance of such investments through the date on which the liquidation of such investments is effected.

Section 8.06    Suspension of Withdrawals.

The General Partner, in its sole discretion, may suspend the right of limited partners to withdraw capital during any period when:

(a)    Any stock exchange or market on which a substantial part of investments owned by the Partnership are traded is closed, other than for ordinary holidays, or dealings thereon are restricted or suspended;

(b)    There exists any state of affairs that constitutes a state of emergency or period of extreme volatility or illiquidity as a result of which (i) disposal of investments of the Partnership would not be reasonably practicable or cannot be completed in a timely fashion to meet withdrawal requirements and might seriously prejudice the Limited Partners or (ii) it is not reasonably practicable for the Partnership to determine fairly the value of its net assets;

(c)    None of the requests for withdrawals which have been made may be lawfully satisfied by the Partnership in U.S. dollars; or

(d)    There is a breakdown in the means of communication normally employed in determining the prices of a substantial part of the investments of the Partnership.

## ARTICLE IX

### Term and Dissolution of the Partnership

Section 9.01    Term of the Partnership.  The Partnership will continue from year to year unless dissolved as hereinafter provided.

EXHIBIT C

Section 9.02    Dissolution of the Partnership.    The General Partner may dissolve the Partnership at any time, and thereupon it will wind up the Partnership's affairs.  If the General Partner withdraws, becomes bankrupt or insolvent, or dissolves, the Partnership will dissolve unless (i) at such time there is another general partner who agrees to continue the business of the Partnership or (ii) an entity controlled by John J. Bartoletta is substituted as general partner to continue the business of the Partnership.  If there is no remaining general partner who agrees to continue the business of the Partnership, or an entity controlled by John J. Bartoletta is not substituted as general partner, the Partnership will dissolve and thereupon be wound up as described in Section 9.03 (i) by the General Partner, or (ii) if the General Partner is unavailable, by the person or persons previously designated by the General Partner, or (iii) if the General Partner has made no such designation, by the person selected by a majority in interest of the Capital Accounts of all the Limited Partners as of the date of dissolution. Such person shall take all steps necessary or appropriate to wind up the affairs of the Partnership as promptly as practicable thereafter.  Such person, including the General Partner in this role, is hereinafter referred to in this Section 9.02 as the "Liquidator."  Neither the admission of Partners nor the retirement, bankruptcy, death, dissolution, legal incapacity or disability of a Limited Partner will dissolve the Partnership.

Section 9.03    Procedure on Winding Up.

(a)    Upon the winding up of the Partnership, a full account of the assets and liabilities of the Partnership will be taken and the assets of the Partnership will be liquidated to the extent determined by the Liquidator and, as promptly as practicable, the assets or cash proceeds thereof will be applied in the following order of priority:

(i)    To the payment of all debts to non-Partners, taxes, obligations and liabilities of the Partnership including the expenses of liquidation and compensation paid to the Liquidator;

(ii)    To the payment of all debts to Partners; and

(iii)    To the payment to Partners of their remaining Capital Accounts in proportion to the amounts thereof.

(b)    In the winding up of the Partnership, the Liquidator may establish reserves for contingent liabilities of the Partnership in an amount (including estimated expenses, if any, in connection therewith) determined by the Liquidator and, upon the satisfaction of such contingent liabilities, the amounts, if any, remaining in such reserves shall be distributed as provided in subparagraph (a)(iii) of this Section 9.03.

(c)    Distributions to a Partner pursuant to subsection (a)(iii) above may be in installments and shall be made in cash or, in the discretion of the Liquidator, in investments selected by the Liquidator, or partly in cash and partly in investments selected by the Liquidator.

(d)    Upon the winding up of the Partnership, the name of the Partnership and its goodwill shall not be appraised, sold or otherwise liquidated but shall remain the exclusive property of the General Partner.

(e)    Within 90 days after the completion of the winding up of the Partnership, the Liquidator shall cause to be prepared and forwarded to each Partner a final statement and report of the Partnership, prepared in accordance with Section 11.05.

## ARTICLE X

### Payments to and by a Person
### Who Has Ceased to be a Partner

Section 10.01  Payments on Retirement, Death, Bankruptcy, or Legal Incapacity of any Partner. Within 30 days after (a) the date of retirement of a Partner hereunder or (b) in the discretion of the General Partner, the last day of the fiscal year during which a Partner died, became bankrupt or legally incapacitated there will be paid or distributed to such Partner or to the legal representative of such Partner, an amount in cash or, in the sole discretion of the General Partner, in investments or partly in cash and partly in investments selected by the General Partner, equal in value to not less than 90% of the estimated amount of the Liquidating Share (as hereinafter defined) of such Partner. Promptly after the General Partner has made a final determination of the value of the Capital Accounts of all the Partners as of such date (which, in the General Partner's sole discretion, may be after the Partnership's auditors have completed their examination thereof required by Section 11.04), the Partnership will pay to such Partner or its representative, in cash and/or investments selected by the General Partner, the amount of the excess, if any, of the Liquidating Share of such Partner over the amount so paid, or such Partner or representative will return and pay to the Partnership in cash the amount of the excess, if any, of the amount so paid over such Liquidating Share, in each case together with interest thereon, to the extent permitted by applicable law, from the applicable date referred to in clauses (a) and (b) above to the date of the payment at an annual rate equal to the rate in effect at the Partnership's prime broker on such applicable date. The term "Liquidating Share," when used with respect to any retiring, deceased, bankrupt, legally incapacitated or disabled Partner, will mean the Capital Account of such Partner on the date in question.

Section 10.02  Reserve for Liabilities.  The right of any retired, deceased, bankrupt, legally incapacitated or disabled Partner (or their legal representative) to have distributed the Liquidating Share of such Partner will in all instances be subject to retention by the Partnership of a reserve, in such amount as the General Partner will determine, in its sole discretion, for Partnership liabilities and contingencies. Upon the General Partner's determination that such reserve (or portion thereof) is no longer required, there will be distributed to such Partner his proportionate share of the reserve which is no longer required together with interest thereon at an annual rate equal to the rate in effect at the Partnership's prime broker at such time.

## ARTICLE XI

### Miscellaneous Provisions

Section 11.01  Withholding Taxes.  The Partnership shall withhold any taxes, fees or other charges the Partnership is required to withhold under applicable law with respect to any Partner (and paid to the appropriate governmental authorities) and will deduct the same from the Capital Account of such Partner as of the last day of the Fiscal Period or fiscal year with respect to which such amount the Partnership is required to withhold.

Section 11.02  Designation of Attorney. Each of the undersigned for himself hereby irrevocably constitutes and appoints the General Partner as his true and lawful attorney in his name, place and stead, to make, execute, sign and file:

(a)  The Certificate of Limited Partnership and any amendment thereto or termination thereof which is or may be required by the laws of the State of Delaware;

(b)  Any certificate required by reason of the dissolution of the Partnership; and

(c)   Any application, certificate, report or similar instrument or document required to be submitted by or on behalf of the Partnership to any governmental or administrative agency or body, to any securities exchange, board of trade, clearing corporation or association or to any self-regulatory organization or trade association.

Said attorney is not by this Section 11.02 granted any authority on behalf of the undersigned to amend this Agreement.

Section 11.03   <u>Maintaining Books of Account</u>.   The General Partner shall keep proper and complete books of account of the Partnership at all times and Limited Partners or their accredited representative will be able to inspect such books of account at reasonable times during office hours.

Section 11.04   <u>Audit of Books</u>.  The General Partner shall designate auditors from time to time that will audit the books of account and records of the Partnership at the end of each fiscal year.

Section 11.05   <u>Reports to Partners</u>.  The General Partner shall furnish to the Limited Partners unaudited reports of the performance of the Partnership promptly after the end of each calendar quarter, and audited financial statements of the performance of the Partnership, including a statement of profit and loss, prepared by the Partnership's auditors, promptly after the end of each fiscal year (using GAAP as a guideline).  In addition, as promptly as practicable after the end of each fiscal year, the General Partner will send each Limited Partner a report indicating the amounts representing their respective share of net long-term capital gain or loss, net short-term capital gain or loss and investment/operating profit or loss, for purposes of reporting such amounts for Federal income tax purposes.

Section 11.06   <u>Amendment of the Agreement</u>.  The General Partner may amend this Agreement in its sole discretion in any manner that does not materially adversely affect any Limited Partner or to effect any changes required by applicable laws or regulations. This Agreement may also be amended by action taken by both the General Partner and the Limited Partners owning a majority in interest of the Capital Accounts of all of the Limited Partners at the time of the amendment, provided that such amendment does not discriminate among the Limited Partners.

Section 11.07   <u>Non-Voting Interests</u>.  Upon written notice to the General Partner, any Limited Partner may waive its voting rights with respect to all or a portion of its limited partnership interest.  A Limited Partner who has waived its voting rights shall not be entitled to exercise any right to consent to actions to be taken with respect to the Partnership, including the approval of any amendments to this Agreement or any right conferred by Delaware law.  For purposes of determining the requisite percentage of Capital Accounts to approve amendments or actions of Limited Partners under this Agreement, the Capital Accounts of Limited Partners that have waived their voting rights shall be disregarded.

Section 11.08   <u>Notices</u>.  All notices provided for under this Agreement will be in writing and will be deemed to have been duly given as indicated if sent to the Partner's address as set forth in the schedule in the files of the Partnership as of the date of such notice:

> (i)     If delivered in person or by courier, on the date it is delivered;
>
> (ii)    If sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted;
>
> (iii)   If sent by first-class mail, two days after the date of postmark;
>
> (iv)    If sent by facsimile, on generation of confirmation; and

EXHIBIT C

      (v)  If sent by electronic mail, upon receipt (by way of clarification, whether or not opened).

   Notice by any Limited Partner to the Partnership will be deemed effective upon receipt by the Partnership.

   A Partner may change his or its address for purposes of this Agreement upon 5 days' prior written notice to the General Partner.

   Section 11.09 <u>Binding Effect of Agreement</u>. This Agreement, including Section 11.02 hereof, will be binding on the successors, assigns and the legal representatives of each of the Partners.

   Section 11.10 <u>Counterparts</u>. This Agreement may be executed in more than one counterpart with the same effect as if the Partners executing the several counterparts had all executed one document.

EXHIBIT C

## SIGNATURE PAGE

IN WITNESS WHEREOF, the undersigned have hereunto signed this LIMITED PARTNERSHIP AGREEMENT as of the date first written above.

**GENERAL PARTNER**

High Street Capital Management, LLC
By: High Street Group, L.L.C.
    Managing Member

**By:** _____

Date of Signature: __3__ / __2 6__ / __09__

**LIMITED PARTNER**

_Eva M. Hemenway_____
Print Name of Limited Partner

X _Eva M Hemenway_____
Signature of Limited Partner or Authorized Signatory

_____
Title of Authorized Signatory

Date of Signature: __3__ / __2H__ / __09__

X _____
Signature (Secondary if needed)

Date of Signature: _____ / _____ / _____

## GENERAL PARTNER ACCEPTANCE

ON BEHALF of New Advantage Futures, L.P., the undersigned hereby accepts this executed LIMITED PARTNERSHIP AGREEMENT.

**GENERAL PARTNER**

High Street Capital Management, LLC
By: High Street Group, L.L.C.
    Managing Member

By: _____

Date of Signature: ___3___ / ___24___ / ___09___

# NEW ADVANTAGE FUTURES, L.P.

*(a Delaware Limited Partnership)*

## SUBSCRIPTION AGREEMENT

THIS **"SUBSCRIPTION AGREEMENT"** (THE "AGREEMENT") IS SUBMITTED TO YOU ON A CONFIDENTIAL BASIS SOLELY IN CONNECTION WITH YOUR CONSIDERATION OF AN INVESTMENT IN LIMITED PARTNERSHIP INTERESTS IN NEW ADVANTAGE FUTURES, L.P., A DELAWARE LIMITED PARTNERSHIP. DUE TO THE CONFIDENTIAL NATURE OF THIS AGREEMENT, ITS USE FOR ANY OTHER PURPOSE MIGHT INVOLVE SERIOUS LEGAL CONSEQUENCES. CONSEQUENTLY, THIS AGREEMENT MAY NOT BE REPRODUCED IN WHOLE OR IN PART, AND MAY NOT BE DELIVERED TO ANY PERSON (OTHER THAN YOUR FINANCIAL ADVISOR) WITHOUT THE PRIOR WRITTEN CONSENT OF THE GENERAL PARTNER.

SUBSCRIPTION AGREEMENT Copy Number: **NAF999414**

# EXHIBIT C

## TABLE OF CONTENTS

ITEM                                                   PAGE

REPRESENTATIONS FOR INDIVIDUALS.................................................................................2

REPRESENTATIONS FOR PENSION PLANS AND IRAs ........................................................2

REPRESENTATIONS FOR TRUSTS OTHER THAN PENSION PLANS ...................................3

REPRESENTATIONS FOR CORPORATIONS AND PARTNERSHIPS .......................................3

SIGNATURE PAGE.............................................................................................................10

CORPORATION (Signature) ...............................................................................................11

PARTNERSHIP (Signature) ................................................................................................11

TRUST (Signature) ............................................................................................................12

QUALIFIED PENSION PLAN (Signature)..............................................................................13

ADDITIONAL REPRESENTATION WITH RESPECT TO INVESTMENT BY AN IRA OR SELF-DIRECTED PENSION PLAN .....................................................................................14

GENERAL PARTNER ACCEPTANCE...................................................................................15

# EXHIBIT C

## SUBSCRIPTION AGREEMENT

The undersigned, *Eva M. Hemenway* _____ (the "New Limited Partner") and New Advantage Futures, L.P., a Delaware Limited Partnership (the "Partnership"), hereby agree as follows:

**FIRST:** The New Limited Partner desires to become a limited partner of the Partnership on: *4 / 1 / 09* (the "Admission Date"). In accordance with the terms of the Limited Partnership Agreement of the Partnership.

The New Limited Partner will make a Capital Contribution to the Partnership on the Admission Date in the amount set forth below.

$ *1,000,000*
**Capital Contribution**

Name: *Eva M Hemenway*

Address: *8491 NW 136th St.*

Number _____ Street

*Chiefland* *FL* *32626*
City _____ State _____ Zip Code

*USA*
Country

~~Social Security Number or Federal Identification Number~~
Social Security Number or Federal Identification Number

The Partnership agrees to admit the New Limited Partner as a limited partner on the Admission Date. The New Limited Partner's Capital Contribution shall be in cash in the form of checks made payable to the Partnership.

**SECOND:** EACH NEW LIMITED PARTNER MUST COMPLETE THE APPROPRIATE REPRESENTATIONS SET FORTH BELOW RELATING TO ITS "ACCREDITED INVESTOR", "QUALIFIED PURCHASER" AND "BENEFIT PLAN INVESTOR" STATUS:

**Accredited Investor Status:**

The New Limited Partner represents that it is an "accredited investor" within the meaning of Regulation D under the U.S. Securities Act of 1933, as amended (the "Securities Act"), and has indicated below each category under which the New Limited Partner qualifies as an accredited investor.

The New Limited Partner is as of the Admission Date:

☐   (i) an individual who had an income in excess of $200,000 in each of the two most recent years (or joint income with his or her spouse in excess of $300,000 in each of those years) and has a reasonable expectation of reaching the same income level in the coming year;

☑   (ii) an individual who has a net worth (or joint net worth with his or her spouse) in excess of $1,000,000;

# EXHIBIT C

   ❑      (iii) an Individual Retirement Account ("IRA") or revocable trust and the individual who established the IRA or each grantor of the trust is an accredited investor on the basis of (i) or (ii) above;

   ❑      (iv) a self-directed pension plan and the participant who directed that assets of his or her account be invested in the Partnership is an accredited investor on the basis of (i) or (ii) above and such participant is the only participant whose account is being invested in the Partnership;

   ❑      (v) a pension plan which is not a self-directed plan and which has total assets in excess of $5,000,000;

   ❑      (vi) an irrevocable trust which consists of a single trust (a) with total assets in excess of $5,000,000, (b) which was not formed for the specific purpose of investing in the Partnership and (c) whose purchase is directed by a person who has such knowledge and experience in financial and business matters that he or she is capable or evaluating the merits and risks of the prospective investment;

   ❑      (vii) a corporation, a partnership or a Massachusetts or similar business trust, that was not formed for the specific purpose of acquiring interest in the Partnership, with total assets in excess of $5,000,000;

   ❑      (viii) an entity in which all of the equity owners are accredited investors; or

   ❑      (ix) none of the above apply (further information may be required to determine accredited investor status).

**Qualified Purchaser Status:**

The New Limited Partner represents and warrants that it is a "qualified purchaser" within the meaning of Section 2(a)(51) of the Investment Company Act of 1940, as amended ("1940 Act") and has indicated below which category under which the New Limited Partner qualifies as a qualified purchaser. In order to complete the following information, New Limited Partners should refer to the Worksheet annexed to this Subscription Agreement for the definition of "Investments" and for information regarding the valuation of Investments.

The New Limited Partner is as of the Admission Date:

   ☑      (i) <u>Individual</u>. An individual who owns not less than $5,000,000 in "Investments" (see annexed Worksheet for a definition of "Investments");

   ❑      (ii) <u>IRA or Self-Directed Pension Plan</u>. An IRA or a self-directed pension plan and the individual who established the IRA or the individual who directed that his or her assets be invested in the Partnership is an individual who owns not less than $5,000,000 in "Investments";

   ❑      (iii) <u>Family Company</u>. A corporation, partnership or trust that (a) was not formed for the specific purpose of acquiring an interest in the Partnership, (b) will not have more than 40% of its net assets invested in the Partnership, (c) owns not less than $5,000,000 in "Investments" and (d) is owned directly or indirectly by or for two or more natural persons who are related as siblings or spouses (including former spouses), or direct lineal descendants by birth or adoption, spouses or estates of such persons, or foundations, charitable organizations or trusts established by or for the benefit of such persons;

# EXHIBIT C

❏    (iv) <u>Trust</u>. A trust that (a) was not formed for the purpose of acquiring an interest in the Partnership and (b) as to which the trustee or other person authorized to make decisions with respect to the trust, and each settlor or other person who has contributed assets to the trust, is a "qualified purchaser";

❏    (v) <u>Employee Benefit Plan</u>. An employee benefit plan that (a) owns $25,000,000 or more in "Investments" and (b) does not permit its participants to decide whether and how much to invest in particular investment alternatives;

❏    (vi) <u>Private Investment Fund</u>. A corporation, partnership or trust (an "entity") that (a) was not formed for the specific purpose of acquiring an interest in the Partnership, (b) will not have more than 40% of its net assets invested in the Partnership, (c) would be an investment company under the 1940 Act but for the exclusions from investment company status in Section 3(c)(1) or 3(c)(7) thereof, (d) owns not less than $25,000,000 in "Investments" and (e) each pre-April 30, 1996 beneficial owner of which has consented to the treatment of the entity as a "qualified purchaser";

❏    (vii) <u>Entity Generally</u>. An entity, other than a private investment fund (see (vi) above) or employee benefit plan (see (v) above), that (a) was not formed for the specific purpose of investing in the Partnership, (b) will not have more than 40% of its net assets invested in the Partnership, and (c) owns and invests on a discretionary basis, for its own account or for the accounts of qualified purchasers, $25,000,000 or more in "Investments";

❏    (viii) <u>Entity Composed Entirely of Qualified Purchasers</u>. An entity, each beneficial owner of the securities of which is a qualified purchaser;

❏    (ix) <u>Qualified Institutional Buyer</u>. A "qualified institutional buyer" as defined in Rule 144A under the Securities Act, acting for its own account, the account of another qualified institutional buyer, or the account of a qualified purchaser (please refer to special instructions in the Worksheet); or

❏    (x) none of the above apply (further information may be required to determine qualified purchaser status

**Benefit Plan Investor Status:**

In order for the Partnership to accurately monitor its "Benefit Plan Investor" participation, please review the following definition of a "Benefit Plan Investor" and make the appropriate representations by checking all applicable boxes following the definition.

A "Benefit Plan Investor" is (i) any employee benefit plan subject to the fiduciary responsibility provisions of Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), (ii) any individual retirement plan or account subject to the prohibited transaction rules of Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code") or (iii) any entity whose underlying assets include "plan assets" (as defined by ERISA and the regulations thereunder) by reason of a plan's investment in the entity.

The New Limited Partner represents that it is (please check all applicable boxes):

A. ☐   not a Benefit Plan Investor; or

B. ☐   a Benefit Plan Investor that is:

# EXHIBIT C

1. ☐ subject to Part 4 of Title I of ERISA;

2. ☐ subject to Section 4975 of the Code (that has not checked B1);

3. ☐ an entity whose underlying assets include "plan assets". The New Limited Partner also represents that the percentage of its "plan assets" compared to the value of its total assets or included in its general account is not more than:

☐ 10% *  ☐ 20% *  ☐ 30%  ☐ 40%
☐ 50%  ☐ 60%  ☐ 70%  ☐ 80%
☐ 90%  ☐ 100%;

( * applicable to entities with multiple classes, one of which exceeds the 25% threshold for Benefit Plan Investors and to U.S. insurance company general accounts)

4. ☐ a group trust, a bank common or collective trust or an insurance company separate account;

The New Limited Partner further agrees (i) to notify the General Partner 30 days prior to this representation (or any part thereof) no longer being true or likely to become untrue and (ii) to provide the General Partner upon request such information as may be required to confirm and/or refine the representations provided above.

**THIRD:** The New Limited Partner further represents, warrants, acknowledges and agrees that:

(a) The New Limited Partner (or its Purchaser Representative, if any, who has been designated by it) is entering into this Agreement relying solely on the facts and terms set forth in this Agreement, the Confidential Private Offering Memorandum of the Partnership, as amended from time to time, (the "Memorandum") and the Partnership Agreement and it has received copies of all such documents and the General Partner has not made any representations of any kind or nature to induce the New Limited Partner to enter into this Agreement except as specifically set forth in such documents;

(b) The New Limited Partner (or such Purchaser Representative) has made an investigation of the pertinent facts relating to the operation of the Partnership and has reviewed the terms of the Partnership Agreement to the extent that it deems necessary in order to be fully informed with respect thereto;

(c) The New Limited Partner (or such Purchaser Representative) has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of an investment in the Partnership and the New Limited Partner is able to bear the economic risk of a complete loss of its investment in the Partnership;

(d) The New Limited Partner will be acquiring the limited partnership interest for investment, for its own account and not for the interest of any other person and not for distribution or resale to others, and it will not permit any other person to acquire a beneficial interest in the limited partnership interest (including, without limitation, by pledge, option, swap or nominee or similar relationship) without the consent of the General Partner. It understands that the limited partnership interests have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), and it agrees that its interest in the Partnership may not be sold, transferred or otherwise disposed of except pursuant to an exemption from registration under the Securities Act. It will not assign its interest in the Partnership or any beneficial interest therein, in whole or in part, to any other person, nor

EXHIBIT C

will it be entitled to substitute for itself as a limited partner any other person, except with the written consent of the General Partner in its sole discretion;

(e)     The New Limited Partner understands the effect of the limitations on disposition and of its representation that its interest in the Partnership will not be sold, transferred or otherwise disposed of except pursuant to an exemption from registration under the Securities Act.  It understands that transfers can be made only with the consent of the General Partner in its sole discretion;

(f)     No person is acting or authorized to act as its Purchaser Representative in connection with its capital contribution to the Partnership, except the person set forth on the signature page of this Agreement as its Purchaser Representative; and

(g)     The New Limited Partner has carefully reviewed the provisions in the Memorandum under the heading "Brokerage and Custody" relating to the brokerage and "soft dollar" or commission arrangements of the Partnership and specifically consents to the Partnership engaging in such arrangements.

**FOURTH:** If the New Limited Partner is a corporation, partnership, limited liability company, trust or other entity, it represents that (i) it is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, (ii) the execution, delivery and performance by it of this Subscription Agreement are within its powers and have been duly authorized by all necessary action on its behalf and (iii) the person executing this Agreement and the Limited Partnership Agreement for the New Limited Partner has the full power and authority under the New Limited Partner's governing instruments to do so.

**FIFTH:** If the New Limited Partner is a corporation, partnership, limited liability company or other entity, the New Limited Partner represents and warrants that (i) it was not formed for the purpose of investing in the Partnership, (ii) based on the most recent valuations available, the New Limited Partner's investment in the Partnership constitutes less than 40% of its net assets and (iii) the New Limited Partner agrees to notify the Partnership promptly if its investment in the Partnership exceeds 40% of its net assets.

**SIXTH:** If the New Limited Partner is or would be an investment company as defined by the Investment Company Act of 1940, as amended (the "1940 Act"), but for the exceptions contained in Section 3(c)(1) or Section 3(c)(7) of the 1940 Act, it recognizes that the Partnership is restricted by law as to the number of beneficial interests held in the Partnership, and, that in determining the number of beneficial interests, it may be necessary to count the beneficial owners of the New Limited Partner if it owns 10% or more of the Limited Partners' interests in the Partnership.  Accordingly, the New Limited Partner agrees to take whatever action is requested by the Partnership to have its interest in the Partnership be less than 10% of the total interests of the Limited Partners and expressly agrees that the General Partner may require the New Limited Partner to withdraw at any time so much of its interest as is necessary to keep such interest below 10%.

**SEVENTH:** Any New Limited Partner that is investing the assets of a benefit plan or account and the person executing this Agreement or the "Additional Representation with Respect to Investment from an IRA or Self-Directed Pension Plan or by a Directed Trustee" on behalf of such New Limited Partner acknowledge that it is intended that the Partnership will not hold "plan assets" subject to Title I of ERISA or Section 4975 of the Code (i.e., less than 25% of each class of the Partnership's equity interests will be held by Benefit Plan Investors).  Accordingly, the New Limited Partner acknowledges that the Partnership has the authority to require the retirement or withdrawal of all or some of the limited partnership interest held by any Benefit Plan Investor if the continued holding of such partnership interest, in the opinion of the General Partner, could result in the Partnership being subject to Title I of ERISA or Section 4975 of the Code.  Further, the New Limited Partner and the person executing this Agreement or the "Additional Representation with


EXHIBIT C

Respect to Investment from an IRA or Self-Directed Pension Plan or by a Directed Trustee" represent and warrant to the Partnership and the General Partner that:

(a)     With respect to the investment in the Partnership, it has been determined that the purchase of the limited partnership interest is consistent with the fiduciary responsibilities under applicable law, including ERISA and the Code, and that (i) the investment in the Partnership is prudent, (ii) the structure, operation and incentives of the fee arrangements have been adequately disclosed, (iii) the calculation of the net asset value of a capital account as described in the Limited Partnership Agreement represents the fair market value of the limited partnership interest; (iv) the New Limited Partner's current and anticipated liquidity needs will be met, given the limited rights to redeem or transfer the limited partnership interest, (v) the investment will permit the New Limited Partner's overall portfolio to remain adequately diversified and (vi) the investment and investment program described in the Memorandum are permitted under the laws, rules and documents governing the New Limited Partner.

(b)     The persons executing this Agreement or the "Additional Representation with Respect to Investment from an IRA or Self-Directed Pension Plan or by a Directed Trustee" (i) are responsible for the decision to invest in the Partnership, (ii) in making the decision to invest in the Partnership, have not relied on any advice or recommendation of the Partnership, the General Partner, any placement agent associated with the Partnership, or any of their affiliates with respect to the investment in the Partnership and (iii) are qualified to make such investment decision and, to the extent deemed necessary, have consulted their own investment advisors and legal counsel regarding the investment in the Partnership.

**EIGTH:**   The New Limited Partner represents that concurrently with the execution of this Agreement, the New Limited Partner has executed and delivered to the Partnership a counterpart of the Limited Partnership Agreement of the Partnership, to be effective upon the New Limited Partner's admission as a partner in the Partnership.

**NINTH:**   (a) The New Limited Partner understands and agrees that the Partnership prohibits the investment of funds by any persons or entities that are acting, directly or indirectly, (i) in contravention of any U.S. or international laws and regulations, including anti-money laundering regulations or conventions, (ii) on behalf of terrorists or terrorist organizations, including those persons or entities that are included on the List of Specially Designated Nationals and Blocked Persons maintained by the U.S. Treasury Department's Office of Foreign Assets Control[7] ("OFAC"), as such list may be amended from time to time, (iii) for a senior foreign political figure, any member of a senior foreign political figure's immediate family or any close associate of a senior foreign political figure[8], unless the General Partner, after being specifically notified by the New Limited Partner in writing that it is such a person, conducts further due diligence, and determines that such investment shall be permitted, or (iv) for a foreign shell bank[9] (such persons or entities in (i) – (iv) are collectively referred to as "Prohibited Persons").

(b)     The New Limited Partner represents, warrants and covenants that: (i) it is not, nor is any person or entity controlling, controlled by or under common control with the New Limited Partner, a Prohibited Person, and (ii) to the extent the New Limited Partner has any beneficial owners[10], (A) it has carried out thorough due diligence to establish the identities of such beneficial owners, (B) based on such due diligence, the New Limited Partner reasonably believes that no such beneficial owners are Prohibited Persons, (C) it holds the evidence of such identities and status and will maintain all such evidence for at least five years from the date of the New Limited Partner's complete withdrawal from the Partnership, and (D) it will make available such information and any additional information that the Partnership may request.

(c)     If any of the foregoing representations, warranties or covenants ceases to be true or if the Partnership no longer reasonably believes that it has satisfactory evidence as to their truth, notwithstanding any other agreement to the contrary, the Partnership may, in accordance with applicable regulations, be obligated to freeze the New Limited Partner's investment, either by prohibiting additional investments, declining or suspending any withdrawal requests and/or segregating the assets constituting the investment, or the New

# EXHIBIT C

Limited Partner's investment may immediately be involuntarily withdrawn by the Partnership, and the Partnership may also be required to report such action and to disclose the New Limited Partner's identity to OFAC or other authority. In the event that the Partnership is required to take any of the foregoing actions, the New Limited Partner understands and agrees that it shall have no claim against the Partnership, the General Partner and their respective affiliates, directors, members, partners, shareholders, officers, employees and agents for any form of damages as a result of any of the aforementioned actions.

(d)     The New Limited Partner understands and agrees that any withdrawal proceeds paid to it will be paid to the same account from which the New Limited Partner's investment in the Partnership was originally remitted, unless the General Partner, in its sole discretion, agrees otherwise.

TENTH: The New Limited Partner agrees to indemnify and hold harmless the Partnership, the General Partner and their respective directors, members, partners, shareholders, officers, employees, agents and affiliates from and against any and all losses, liabilities, damages, penalties, costs, fees and expenses (including legal fees and disbursements) that may result, directly or indirectly, from any inaccuracy in or breach of any representation, warranty, covenant or agreement set forth in this Agreement or in any other document delivered by the New Limited Partner to the Partnership.

ELEVENTH: The New Limited Partner recognizes that non-public information concerning the New Limited Partner set forth in this Agreement or otherwise disclosed by the New Limited Partner to the Partnership, or other agents of the Partnership, such as the New Limited Partner's name, address, social security number, assets and income, and information regarding the New Limited Partner's investment in the Partnership (collectively, the "Information") (i) may be disclosed to the Partnership's General Partner, attorneys, accountants and auditors in furtherance of the Partnership's business and to other service providers such as brokers who may have a need for the Information in connection with providing services to the Partnership, (ii) to third party service providers or financial institutions who may be providing marketing services to the Partnership provided that such persons must agree to protect the confidentiality of the Information and use the Information only for the purposes of providing services to the Partnership, and (iii) as otherwise required or permitted by law. The Partnership and General Partner restrict access to the Information to their employees who need to know the Information to provide services to the Partnership, and maintain physical, electronic and procedural safeguards that comply with U.S. federal standards to guard the Information.

TWELFTH:     Electronic Delivery of Reports and Other Communications. The Partnership and/or the General Partner or the Management Company or the Administrator acting on their behalf may provide the New Limited Partner (or its designated agents) with statements, reports and other communications relating to the Partnership and/or the New Limited Partner's investment in the Partnership (such as subscription and withdrawal activity, annual and other updates of the Partnership's consumer privacy policies and procedures) (collectively, the "Partnership Information") in electronic form, such as e-mail, in lieu of or in addition to sending such communications as hard copies via fax or mail. E-mail messages are not secure and may contain computer viruses or other defects, may not be accurately replicated on other systems, or may be intercepted, deleted or interfered with without the knowledge of the sender or the intended recipient. The Partnership, the General Partner, the Management Company and the Administrator make no warranties in relation to these matters. The Partnership, the General Partner, the Management Company and the Administrator reserve the right to intercept, monitor and retain e-mail messages to and from its systems as permitted by applicable law. If the New Limited Partner has any doubts about the authenticity of an e-mail purportedly sent by the Partnership, the General Partner, the Management Company or the Administrator, the New Limited Partner is required to contact the purported sender immediately. The General Partner's acceptance of your subscription is not conditioned on your giving consent to electronic delivery of Partnership Information. If you do not have access to the internet or e-mail, you should not consent to electronic delivery of Partnership Information. You may revoke your consent to electronic delivery of Partnership Information at any time upon written notice to the Partnership and receive all Partnership Information in paper format.

EXHIBIT C

Please check the appropriate box:

☐    The New Limited Partner hereby agrees to receive Partnership Information in electronic form in lieu of or in addition to separate mailing of paper copies.

☑    The New Limited Partner declines to receive Partnership Information in electronic form in lieu of or in addition to separate mailing of paper copies.

**THIRTEENTH:** The New Limited Partner hereby acknowledges that the New Limited Partner has received (not less than 48 hours prior to executing this Agreement) and had an opportunity to review the Form ADV, Part II of High Street Financial LLC, the Management Company of the Partnership.

**FOURTEENTH:** The New Limited Partner hereby agrees that (i) any representation made hereunder will be deemed to be reaffirmed by it at any time it makes an additional capital contribution to the Partnership and such additional contribution will be evidence of such reaffirmation, and (ii) if any of the statements, representations, warranties or covenants made herein become untrue or inaccurate, the undersigned shall immediately notify the Partnership.

**FIFTEENTH:** This Agreement shall inure to the benefit of and be binding upon each of the parties hereto, his or her heirs and legal representatives. This Agreement may be executed in counterparts, all of which when taken together shall be deemed one original.

SPECIAL NOTICE TO GEORGIA INVESTORS: THE LIMITED PARTNERSHIP INTERESTS WILL BE SOLD IN RELIANCE ON THE EXEMPTION FROM SECURITIES REGISTRATION CONTAINED IN PARAGRAPH 13 OF CODE SECTION 10-5-9 OF THE GEORGIA SECURITIES ACT OF 1973, AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT FROM SUCH ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SUCH ACT.

EXHIBIT C

## SIGNATURE PAGE

IN WITNESS WHEREOF, the undersigned have hereunto signed this SUBSCRIPTION AGREEMENT as of the date written below.

**GENERAL PARTNER**

High Street Capital Management, LLC
By: High Street Group, L.L.C.
    Managing Member

By: _____

Date of Signature: __3__ / __24__ / __09__

**LIMITED PARTNER**

**INDIVIDUAL (Signature)**

_Eva M. Hemenway_____
Print Name of Limited Partner

X _____Eva M Hemenway_____
Signature of Limited Partner or Authorized Signatory

_____
Title of Authorized Signatory

Date of Signature: __3__ / __24__ / __09__

X _____
Signature (Secondary if needed)

Date of Signature: _____ / _____ / _____

SUBSCRIPTION AGREEMENT      10      NEW ADVANTAGE FUTURES, L.P.

# EXHIBIT C

**CORPORATION (Signature)**

_____
Print Name of Limited Partner

X _____
Signature of Limited Partner or Authorized Signatory **Officer(s)**

_____
Title of Authorized Signatory **Officer(s)**

**Date of Signature:** _____ / _____ / _____

**PARTNERSHIP (Signature)**

_____
Print Name of Limited Partner 1

X _____
Signature of Limited Partner 2 or Authorized Signatory **Partner(s)**

_____
Title of Authorized Signatory **Partner(s)**

**Date of Signature:** _____ / _____ / _____

_____
Print Name of Limited Partner 2

X _____
Signature of Limited Partner 2 or Authorized Signatory **Partner(s)**

_____
Title of Authorized Signatory **Partner(s)**

**Date of Signature:** _____ / _____ / _____

EXHIBIT C

**TRUST (Signature)**

_____
Print Name of Limited Partner

X _____
Signature of Limited Partner or Authorized Signatory Trustee(s)[1]

_____
Title of Authorized Signatory **Trustee(s)**

**Date of Signature:** _____ / _____ / _____

X _____
Signature (Additional Trustee if needed)

Date of Signature: _____ / _____ / _____

X _____
Signature (Additional Trustee if needed)

Date of Signature: _____ / _____ / _____

X _____
Signature (Additional Trustee if needed)

Date of Signature: _____ / _____ / _____

X _____
Signature (Additional Trustee if needed)

Date of Signature: _____ / _____ / _____

---

[1] If the New Limited Partner is a self-directed pension plan or this Agreement is being executed by a directed trustee, the trustee of the New Limited Partner executes this Agreement and the fiduciary who directed the pension plan's investment in the Partnership is required to execute the representation on the page following the Custodian Signature.

EXHIBIT C

**CUSTODIAN ACCOUNT (Signature)**

_____
Print Name of Limited Partner

X _____
Signature of Limited Partner or Authorized Signatory **Custodian**[2]

_____
Title of Authorized Signatory **Custodian)**

**Date of Signature:** _____ / _____ / _____

---

[2] If the New Limited Partner is an IRA, the custodian of the New Limited Partner executes this Agreement and the fiduciary who directed the IRA's investment in the Partnership is required to execute the representation on the next page.

EXHIBIT C

**ADDITIONAL REPRESENTATION WITH RESPECT TO
INVESTMENT FROM AN IRA OR SELF-DIRECTED PENSION PLAN
OR BY A DIRECTED TRUSTEE**

If the New Limited Partner is an IRA or a self-directed pension plan or this Agreement is being executed by a directed trustee, the individual who established the IRA or the person who directed the pension plan's investment in the Partnership, as the case may be: (i) has directed the custodian or trustee of the New Limited Partner to execute this Agreement on the line set forth above for Authorized Signatory; (ii) has exclusive authority with respect to the decision to invest in the Partnership; and (iii) has signed below to indicate that he or she has reviewed, directed and certifies to the accuracy of the representation and warranties made by the New Limited Partner herein.

_____
Print Name of Limited Partner

X _____
Signature

**Date of Signature:** _____ / _____ / _____

**INFORMATION OF CUSTODIAN**

Name of Custodian        _____

Address:        _____
                Number                    Street

                _____
                City            State            Zip Code

                _____
                Country

Account or Reference Number: _____

Custodian's Tax I.D.Number: _____

SUBSCRIPTION AGREEMENT                    14                    NEW ADVANTAGE FUTURES, L.P.



## GENERAL PARTNER ACCEPTANCE

ON BEHALF of New Advantage Futures, L.P., the undersigned hereby accepts this executed SUBSCRIPTION AGREEMENT.

**GENERAL PARTNER**

High Street Capital Management, LLC
By: High Street Group, L.L.C.
    Managing Member

By: _____

Date of Signature: ___3___/___24___/___09___

EXHIBIT C

WORKSHEET

Determination of "Investments" for
Purposes of Section SECOND of the Subscription Agreement

When determining ownership in "Investments" the following general rules are applicable:

1.  Investments should be valued at either their fair market value as of the most recent practicable date or at cost.

2.  Investments include investments held jointly with the New Limited Partner's spouse.

3.  Investments include investments held in any IRA, 401(k) or similar retirement account directed by the New Limited Partner and held for the New Limited Partner's benefit.

4.  There must be <u>excluded</u> from the value of each Investment the principal amount of any outstanding debt, including margin loans, incurred by the New Limited Partner (or any of the owners of the New Limited Partner) to acquire or for the purpose of acquiring the Investment.

5.  Investments include the following:

    (A)  securities which are publicly-traded and listed on a U.S. national securities exchange or traded on NASDAQ;

    (B)  shares in registered investment companies such as mutual funds and money market funds;

    (C)  interests in private investment companies such as hedge funds, commodity pools and similar private investment companies (such as the Partnership);

    (D)  cash and cash equivalents (including foreign currencies) held for investment purposes;

    (E)  real estate held for investment purposes; and

    (F)  shares of non-public companies which have total shareholder equity of $50 million or more.

6.  Investments <u>**DO NOT**</u> include the following:

    (A)  jewelry, artwork, antiques and collectibles;

    (B)  investments held in retirement accounts where the New Limited Partner does <u>not</u> make the investment decisions (e.g., an employer retirement plan where the investment decisions are not directed by the New Limited Partner); and

    (C)  shares in a non-public company in which the New Limited Partner has a controlling interest (presumed to exist if the New Limited Partner owns more than 25% of the voting interests).

EXHIBIT C

7.  Special instructions for a New Limited Partner that is a qualified purchaser based on its status as a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act. In order to be a qualified purchaser if the New Limited Partner is a dealer as described in paragraph (a)(1)(ii) of Rule 144A, the New Limited Partner must own and invest on a discretionary basis at least $25 million in securities of issuers that are not affiliated persons of the dealer. In addition, a plan referred to in paragraph (a)(1)(D) or (a)(1)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(F) of Rule 144A that holds the assets of such a plan will not be deemed to be acting for its own account and, accordingly, will not be deemed to be a qualified purchaser on the basis of "qualified institutional buyer" status if investment decisions with respect to the plan are made by beneficiaries of the plan, except with respect to investment decisions made solely by the fiduciary, trustee or sponsor of such plan.

# EXHIBIT C

# NEW ADVANTAGE FUTURES, L.P.

*(a Delaware Limited Partnership)*

## LIMITED PARTNERSHIP AGREEMENT

### January 2009

THIS **"LIMITED PARTNERSHIP AGREEMENT"** IS SUBMITTED TO YOU ON A CONFIDENTIAL BASIS SOLELY IN CONNECTION WITH YOUR CONSIDERATION OF AN INVESTMENT IN LIMITED PARTNERSHIP INTERESTS IN NEW ADVANTAGE FUTURES, L.P., A DELAWARE LIMITED PARTNERSHIP AS STATED IN THE CONFIDENTIAL PRIVATE OFFERING MEMORANDUM. DUE TO THE CONFIDENTIAL NATURE OF THIS LIMITED PARTNERSHIP AGREEMENT, ITS USE FOR ANY OTHER PURPOSE MIGHT INVOLVE SERIOUS LEGAL CONSEQUENCES. CONSEQUENTLY, THIS LIMITED PARTNERSHIP AGREEMENT MAY NOT BE REPRODUCED IN WHOLE OR IN PART, AND MAY NOT BE DELIVERED TO ANY PERSON WITHOUT THE PRIOR WRITTEN CONSENT OF THE GENERAL PARTNER.

LIMITED PARTNERSHIP AGREEMENT Copy Number:   **NAF999414**

# EXHIBIT C

# TABLE OF CONTENTS

**ITEM**                                                         **PAGE**

ARTICLE I  General Provisions ..... 2

ARTICLE II  Admissions ..... 3

ARTICLE III  Management of Partnership ..... 3

ARTICLE IV  Expenses of the Partnership, Overhead Expenses, Organizational Expenses and Management Fee ..... 5

ARTICLE V  Capital Accounts and Capital Contributions ..... 5

ARTICLE VI  Allocation of Net Profits and Net Losses ..... 6

ARTICLE VII  Allocation of Income for Tax Purposes ..... 7

ARTICLE VIII  Withdrawals from Capital Accounts and Retirements ..... 8

ARTICLE IX  Term and Dissolution of the Partnership ..... 9

ARTICLE X  Payments to and by a Person Who Has Ceased to be a Partner ..... 11

ARTICLE XI  Miscellaneous Provisions ..... 11

SIGNATURE PAGE ..... 14

GENERAL PARTNER ACCEPTANCE ..... 15

EXHIBIT C

# LIMITED PARTNERSHIP AGREEMENT

AGREEMENT OF LIMITED PARTNERSHIP, amended and restated, as of January 1, 2009, by and among High Street Capital Management, LLC, a Delaware limited liability company, as General Partner (the "General Partner") and all the parties who sign copies of this agreement to become Limited Partners (herein called the "Limited Partners"). (The General Partner and the persons who sign as Limited Partners are sometimes collectively referred to as the "Partners"). Whenever the masculine or feminine gender is used in this Agreement, it will equally, where the context permits, include the other, as well as include entities.

## ARTICLE I

### General Provisions

Section 1.01  Formation. The original parties hereto hereby form New Advantage Futures, L.P. as a limited partnership (the "Partnership") pursuant to the provisions of the Delaware Revised Uniform Limited Partnership Act (the "Act"). The existence of the Partnership commenced upon the filing with the Secretary of State of Delaware of a Certificate of Limited Partnership in accordance with the provisions of such law.

Section 1.02  Partnership Name. The name of the Partnership is New Advantage Futures, L.P.

Section 1.03  Purpose. The purpose of the Partnership is to serve as a fund through which the assets of its Partners will be utilized to invest, hold and trade in future contracts, commodities and other financial instruments and rights and options relating thereto.

Section 1.04  Registered Office and Agent for Service of Process. The registered office of the Partnership is 1209 Orange Street, Wilmington, Delaware 19801, and the registered agent for service of process at such office is The Corporation Trust Company.

Section 1.05  Place of Business. The principal place of business of the Partnership shall be 12802 Tampa Oaks Boulevard, Suite 405, Tampa, Florida 33637-1915.

Section 1.06  Fiscal Year and Fiscal Periods. The fiscal year of the Partnership will end on December 31 each year, subject to change by the General Partner from time to time. A new fiscal period ("Fiscal Period") will commence on the first day of each fiscal quarter, on each date of any capital contribution to the Partnership and on each date next following the date of any withdrawal of capital or retirement from the Partnership, and the prior Fiscal Period will end on the date immediately preceding such date of commencement of a new Fiscal Period.

Section 1.07  Liability of Limited Partners. Except as expressly provided in the Delaware Revised Uniform Limited Partnership Act, the Limited Partners will not be liable for any liabilities, or for the payment of any debts and obligations, of the Partnership.

Section 1.08  Assignability of Limited Partnership Interest. The limited partnership interest of a Limited Partner in the Partnership or any beneficial interest therein may not be assigned, in whole or in part, except with the written consent thereto of the General Partner given in its sole discretion. Upon such an assignment of a limited partnership interest, the assignee will become a Limited Partner upon the execution of such agreements and other documents as the General Partner will require.

EXHIBIT C

## ARTICLE II

### Admissions

Section 2.01    Admission of Partners.   With the consent of the General Partner, additional Limited Partners may be admitted to the Partnership on the first day of each month and at such other times as the General Partner will, in its sole discretion, permit.  In connection with the admission of a Partner to the Partnership, such Partner will, in advance of such admission and as a condition thereto, sign a copy of this Agreement or a supplement hereto pursuant to which he agrees to be bound by the terms of this Agreement.  The General Partner may admit additional or substitute general partners (i) as of the first day of any calendar year upon 45 days' prior written notice to all Limited Partners, (ii) at any time with the consent of the majority in interest of the Limited Partners or (iii) at any time if such additional or substitute general partners are affiliates of the General Partner or the Management Company (defined in Section 3.02), or are entities controlled by John J. Bartoletta, the managing members of the General Partner, without any notice to or consent of the Limited Partners.

## ARTICLE III

### Management of Partnership

Section 3.01    Management of the Partnership.   The General Partner will manage the Partnership, which shall have the discretion of making investments on behalf of the Partnership and of exercising the powers set forth in Section 3.02.  The General Partner may appoint such agents of the Partnership as it deems necessary who will hold such offices and shall, under the direction of the General Partner, exercise such powers of the General Partner in the management of the Partnership and perform such duties in connection therewith as the General Partner shall determine from time to time.  The General Partner will devote so much of its time and efforts to the affairs of the Partnership as may, in its judgment, be necessary to accomplish the purposes of the Partnership.  Nothing herein contained will prevent the General Partner, Management Company (as defined below) and their respective affiliates, principals, members and employees or any other Partner from conducting any other business, including any business within the securities industry; whether or not such business is in competition with the Partnership.  Without limiting the generality of the foregoing, the General Partner, the Management Company and their respective affiliates, principals, members and employees may act as the investment adviser or the investment manager for others, may manage funds or capital for others, may have, make and maintain investments in their name or through other entities, and may serve as officers, directors, consultants, partners or stockholders of one or more investment funds, partnerships, securities firms or advisory firms.

Section 3.02    Powers of the General Partner.  The General Partner will have the following powers to exercise on behalf of the Partnership in accordance with Section 3.01:

> (a)    To purchase, hold, sell and otherwise deal in commodities, commodity contracts, commodity futures, financial futures and options in respect thereof, including restricted investments, on margin or otherwise;

> (b)    To write, purchase, hold, sell and otherwise deal in put and call options of any sort and in any combination thereof;

> (c)    To purchase, hold, sell and otherwise deal in currencies, forwards, partnership interests, interests in other investment companies and any other financial instruments that exist now or are hereafter created;

> (d)    To conduct margin accounts with brokers; to open, maintain and close bank accounts and draw checks or other orders for the payment of moneys; to pledge


EXHIBIT C

investments for loans, and to effect borrowings from brokers, banks and other financial institutions;

(e)　To enter into, make and perform any other contracts, agreements or other undertakings it may deem advisable in conducting the business of the Partnership, including but not limited to contracts, agreements or other undertakings with persons, firms or corporations with which the General Partner or any other Partner is affiliated;

(f)　To appoint High Street Financial, LLC, to serve as the management company of the Partnership (the "Management Company") to be responsible for investment decisions and certain administrative services;

(g)　To retain a third party administrator whose expenses will be paid by the Partnership; and

(h)　To act for the Partnership in all other matters.

Section 3.03　　Limitation of Liability; Indemnification.

(a)　Neither the General Partner, nor any person or persons designated pursuant to Sections 9.02, will be liable for any loss or cost arising out of, or in connection with, any act or activity undertaken (or omitted to be undertaken) in fulfillment of any obligation or responsibility under this Agreement, including any such loss sustained by reason of any investment or the sale or retention of any security or other asset of the Partnership, except that any person exculpated from liability under this Section will not be exculpated from any liability arising from losses caused by his, her or its gross negligence, willful misconduct or violations of applicable law.

(b)　The General Partner, the Management Company, and their respective principals, members, officers, agents, affiliates and employees, and each person designated pursuant to Section 9.02 (each an "Indemnitee") shall be indemnified and held harmless by the Partnership to the fullest extent legally permissible under and by virtue of the laws of the State of Delaware, as amended from time to time and U.S. securities laws, from and against any loss, liability and expense (including, without limitation, judgments, fines, amounts paid or to be paid in settlement and reasonable attorneys' fees and expenses) incurred or suffered by an Indemnitee in connection with the good faith performance by an Indemnitee of its responsibilities to the Partnership; provided, however, that an Indemnitee shall not be indemnified for any liability arising from losses caused by its gross negligence, willful misconduct or violations of applicable law. The Partnership shall, in the discretion of the General Partner, advance amounts and/or pay expenses as incurred in connection with the indemnification obligation herein. In the event this indemnification obligation shall be deemed to be unenforceable, whether in whole or in part, such unenforceable portion shall be stricken or modified so as to give effect to this paragraph to the fullest extent permitted by law. The indemnification provided in this Section shall in no event cause any Limited Partner to incur any liability beyond the limited liability provided in Section 1.07.

EXHIBIT C

## ARTICLE IV

### Expenses of the Partnership, Overhead Expenses, Organizational Expenses and Management Fee

Section 4.01    Expenses of the Partnership.  The General Partner shall be authorized to incur and pay in the name and on behalf of the Partnership all expenses that it deems necessary or desirable.

Section 4.02    Overhead Expenses. The Management Company will be responsible for and will pay all overhead expenses of an ordinary and recurring nature such as rent, supplies, secretarial expenses, stationery, charges for furniture and fixtures, employee insurance, payroll taxes and compensation of employees.  All other expenses will be borne by the Partnership including legal, accounting, auditing, and other professional expenses, administrator fees and expenses, research expenses, investment expenses such as commissions, custodial fees, bank service fees and other expenses related to the purchase, sale or transmittal of Partnership assets.

Section 4.03    Organizational Expenses.  The Partnership will pay its organizational expenses, including expenses incurred in connection with the initial offer and sale of interests in the Partnership ("Organizational Expenses").  The Partnership has borne and is amortizing its Organizational Expenses over a period of 60 months from the date the Partnership commenced operations because the Partnership believes that such treatment is more equitable than expensing the entire amount of Organizational Expenses when incurred, as is required by generally accepted accounting principles ("GAAP").

Section 4.04    Management Fee.  The Partnership shall pay the Management Company a quarterly management fee in advance calculated at the rate of 2.0% per annum of the net assets of the Partnership (the "Management Fee").  The Management Fee shall be payable promptly after the first day of each calendar quarter based on the value of the net assets of the Partnership as of the first day of such quarter.  The Management Fee shall be prorated for periods less than a full quarter.  If a Limited Partner makes additional contributions to the Partnership during a quarter, the General Partner shall prorate the Management Fee and charge it to such Limited Partner at the time of such contribution.  The General Partner, in its sole discretion, may waive or reduce the Management Fee for Limited Partners that are principals, employees or affiliates of the General Partner or the Management Company, relatives of such persons, and for certain strategic investors.

## ARTICLE V

### Capital Accounts and Capital Contributions

Section 5.01    Capital Accounts.  A Partner's "Capital Account" as of a particular date will consist of the following:

(a)    An amount equal to his original capital contribution;

(b)    The additions, if any, to such account by reason of capital contributions made on or before such date; and

(c)    The adjustments, if any, to such account in accordance with the provisions of Sections 4.04, 5.03 and 11.01 and Article VI.

Section 5.02    Capital Contributions.  The Partnership will accept only cash contributions to the capital of the Partnership.

EXHIBIT C

Section 5.03    <u>Certain Adjustments to Capital Accounts</u>.  The amount of withdrawals, if any, made by a Partner will be deducted from such Partner's Capital Account as of the date of such withdrawal.

Section 5.04    <u>Additional Contributions to Capital</u>.  A Partner may make additional contributions to the capital of the Partnership on the first day of each calendar quarter and at such other times as the General Partner shall, in its sole discretion, permit.

## ARTICLE VI

**Allocation of Net Profits and Net Losses;
Determination of Net Profits and Net Losses**

Section 6.01    <u>Allocation of Net Profits and Net Losses.</u>

(a)    Any Net Profits or Net Losses (as defined in Section 6.02) during any Fiscal Period shall be allocated as of the end of such Fiscal Period to the Capital Accounts of all the Partners in the proportions that each Partner's Capital Account as of the beginning of such Fiscal Period bore to the aggregate of the Capital Accounts of all the Partners as of the beginning of such Fiscal Period.

(b)    If in any fiscal quarter ("Current Quarter") the Net Profits allocated to the Capital Account of a particular Limited Partner pursuant to Sections 6.01 exceed the Net Losses so allocated to the Capital Account of such Limited Partner, 20% of the Net Profits will be reallocated to the Capital Account of the General Partner at the end of the Current Quarter (the "Incentive Allocation"); provided, however, that no Incentive Allocation with respect to a particular Limited Partner will be made until the Net Profits for the Current Quarter exceed such Limited Partner's loss carryforward amount applicable to the Current Quarter.  The loss carryforward amount for a particular Limited Partner applicable to the Current Quarter shall be the sum of all prior quarter Net Losses allocated to the Limited Partner that have not been subsequently offset by prior quarter Net Profits; provided, however, that the loss carryforward amount will be reduced proportionately to reflect any withdrawals made by such Limited Partner.  The General Partner, in its sole discretion may, waive or reduce the Incentive Allocation for Limited Partners that are principals, employees or affiliates of the General Partner or the Management Company, relatives of such persons, and for certain strategic investors.

(c)    Notwithstanding that the Incentive Allocation shall be reallocated to the General Partner at the end of any fiscal quarter, in the event that a Limited Partner redeems or withdraws or is required to retire at any time other than the end of a fiscal quarter or in the General Partner's sole discretion, the General Partner shall be entitled to the Incentive Allocation, with respect to such Limited Partner, on the applicable withdrawal or retirement date.

Section 6.02    <u>Determination of Net Profits and Net Losses</u>.  "Net Profits" or "Net Losses" of the Partnership for a Fiscal Period will be determined on the accrual basis of accounting using GAAP as a guideline and further in accordance with the following.

(a)    Net Profits and Net Losses shall include realized and unrealized profits and losses with respect to all investments.  In computing such realized and unrealized profits and losses, profit and loss will mean for each position held in a security during any Fiscal Period, the realized or unrealized appreciation or realized or unrealized depreciation, as the case may be, with respect to such position, determined by comparing the net proceeds from the closing of such position or the market value of such position at the end of such Fiscal Period with (i) the cost of such position if established during such Fiscal Period or, (ii) if such position was established during a prior Fiscal Period, the market value of such position at the end of the last preceding

Fiscal Period. Investments contributed to the Partnership shall be treated as if purchased by the Partnership at market value on the date of contribution and investments distributed from the Partnership shall be treated as if sold by the Partnership at market value on the date of distribution.

(b)     The market value of a commodity future, financial future, forward or other similar contract shall be the most recent available closing quotation on such exchange; provided, however, that if the General Partner determines that such closing price does not accurately reflect the market value due to price limit constraints, such contract shall be valued at fair market value as determined by the General Partner, provided that such valuation is based on independent pricing sources.

(c)     The General Partner will determine the manner of valuing all other assets and liabilities of the Partnership, provided that such valuation is based on independent pricing sources.

(d)     There will be deducted in computing Net Profits and Net Losses estimated expenses for legal and audit services and other expenses, if any, in respect of the particular Fiscal Period (whether performed therein or to be performed thereafter), and such reserves for contingent liabilities of the Partnership, including estimated expenses, if any, in connection therewith, as the General Partner shall determine. The Management Fee shall be deducted in computing Net Profits and Net Losses; however, overhead expenses borne by the Management Company pursuant to Section 4.02 will not be deducted in computing Net Profits and Net Losses.

(e)     The Organizational Expenses of the Partnership are being amortized over a period of 60 months from the date the Partnership commenced operations, and the amortizable portion of the Organizational Expenses may be deducted in computing Net Profits and Net Losses.

## ARTICLE VII

### Allocation of Income for Tax Purposes

Section 7.01     Ordinary Deductions and Ordinary Income. For Federal income tax purposes, all items of deduction other than losses from the sale or deemed sale of investments, and all items of income other than gains from the sale or deemed sale of investments, shall be allocated, as nearly as is practicable, in accordance with the manner in which such items of deduction or income affected the amounts that were either deducted from or added to the Capital Accounts of the Partners.

Section 7.02     Gains and Losses on Contributed Securities. For Federal income tax purposes, gains and losses from the sale or deemed sale of investments recognized by the Partnership on the disposition of investments contributed by a Partner to the capital of the Partnership will be allocated in accordance with the provisions of Section 704(c) of the Internal Revenue Code of 1986, as amended.

Section 7.03     Other Gains and Losses. Except as provided in Section 7.02, for Federal income tax purposes, gains and losses from the sale or deemed sale of investments shall be allocated, as nearly as is practicable, in accordance with the manner in which the increase or decrease in the value of the investments giving rise to such gains or losses was added to or deducted from the Capital Accounts of the Partners. The Partnership may, but is not required to, use an aggregate approach in making such allocations.

Section 7.04     Allocation of Gains and Losses to Retiring Partners. Notwithstanding Section 7.03 above, in the event a Partner retires from the Partnership (including mandatory withdrawals

EXHIBIT C

under Section 8.04), the General Partner, in its sole discretion, may make a special allocation to said Partner for Federal income tax purposes of the gains or losses, as the case may be, recognized by the Partnership in such a manner as will reduce the amount of the difference, if any, of such Partner's Liquidating Share (as defined in Section 10.01) and his Federal income tax basis in his interest in the Partnership before such allocation.

Section 7.05    Death of a Partner.  If a Partner dies on a day other than the last day of a Fiscal Period, all items of income, gain, loss or deduction for such Fiscal Period allocable to such Partner pursuant to this Article VII shall be allocated to such Partner for Federal income tax purposes based on a fraction, the numerator of which shall be the number of days (including the date of death) that the Partner was alive during such Fiscal Period, and the denominator of which is the total number of days in such Fiscal Period.  The balance of such items allocable to such Partner for such Fiscal Period shall be allocated to the deceased Partner's estate.  Each Partner agrees on behalf of the Partner and the Partner's estate that any executor or other fiduciary filing any tax returns on their behalf will treat this allocation as effecting a termination of the taxable year of the Partnership for Federal income tax purposes in order to determine their respective shares of such items for any applicable reporting period.

## ARTICLE VIII

### Withdrawals from Capital Accounts and Retirements

Section 8.01    Permissible Withdrawals.  A Partner may withdraw all or any part of its Capital Account (as defined in Section 5.01) in the manner and to the extent provided in Section 8.02.

Section 8.02    Withdrawal Procedure.

(a)    Upon giving at least 30 days' prior written notice to the General Partner, a Limited Partner may withdraw all or any part of its Capital Account as of the end of each fiscal quarter; provided, however, that a Limited Partner may not withdraw any part of its Capital Account attributable to a particular capital contribution until at least twelve months after such contribution was made to the Partnership. Any Limited Partner desiring to make a withdrawal from its Capital Account shall give written notice to the Partnership of (i) such Limited Partner's intention to make such withdrawal and (ii) the amount thereof or the basis upon which such amount is to be determined. Notwithstanding the foregoing, the General Partner, in its sole discretion, may waive or modify any terms related to withdrawals for Limited Partners that are principals, employees or affiliates of the General Partner or the Management Company, relatives of such persons, and for certain strategic investors.

(b)    The General Partner may withdraw all or any part of its Capital Account as of the last day of each fiscal quarter; provided that if the amount so proposed to be withdrawn by the General Partner would be in excess of the initial capital contribution of the General Partner to the Partnership, the General Partner shall, not less than 45 days before such date, notify the other Partners of (i) its intention to make such withdrawal and (ii) the amount thereof or the manner in which the amount thereof is to be determined. Notwithstanding the foregoing, the General Partner will not make a withdrawal if doing so would reduce its capital account balance below the lesser of $100,000 or 1% of the total capital of the Partnership.

(c)    A Partner withdrawing its entire Capital Account pursuant to this Section 8.02 will be deemed to have retired as of the date of such withdrawal. Limited Partners who make partial withdrawals will be paid as promptly as practicable, generally within 30 days.

Section 8.03    Payment on Retirement.  Retirement of a Partner, whether by (a) withdrawal of such Partner's entire Capital Account, or (b) action of the General Partner under Section 8.04, will be subject to the provisions of Article X.

EXHIBIT C

Section 8.04    Mandatory Withdrawals. The General Partner, in its sole discretion, may require any Limited Partner to withdraw all or any part of its Capital Account from the Partnership at any time on not less than 20 days' notice, such withdrawal to be effective on the date specified in such notice. If the General Partner, in its sole discretion, deems it to be in the best interests of the Partnership to do so because the continued participation of any Limited Partner in the Partnership might cause the Partnership to violate any law, rule or regulation or expose the Partnership to the risk of litigation, arbitration, administrative proceedings or any similar action or proceeding, the General Partner may require such Limited Partner to withdraw all or any part of its Capital Account from the Partnership at any time on not less than 5 days' notice, such withdrawal to be effective on the date specified in such notice. A Limited Partner who is so required to retire pursuant to this Section 8.04 will be entitled to receive the value of his Liquidating Share (as defined in Section 10.01) computed as of the date on which such Limited Partner's retirement will become effective.

Section 8.05    Distributions in Cash or in Kind. All distributions to a Partner by reason of the Partner's withdrawal or retirement from the Partnership (including required retirements under Section 8.04) shall be made in cash or, in the sole discretion of the General Partner, in investments or partly in cash and partly in investments selected by the General Partner. In-kind distributions may be made directly to the withdrawing Partner or, alternatively, in certain limited circumstances, distributed into a liquidating trust or account and sold for the benefit of such Partner, in which case (i) payment to such partner of that portion of his withdrawal attributable to such investments will be delayed until such time as such investments can be liquidated and (ii) the amount otherwise due such partner will be increased or decreased to reflect the performance of such investments through the date on which the liquidation of such investments is effected.

Section 8.06    Suspension of Withdrawals.

The General Partner, in its sole discretion, may suspend the right of limited partners to withdraw capital during any period when:

(a)    Any stock exchange or market on which a substantial part of investments owned by the Partnership are traded is closed, other than for ordinary holidays, or dealings thereon are restricted or suspended;

(b)    There exists any state of affairs that constitutes a state of emergency or period of extreme volatility or illiquidity as a result of which (i) disposal of investments of the Partnership would not be reasonably practicable or cannot be completed in a timely fashion to meet withdrawal requirements and might seriously prejudice the Limited Partners or (ii) it is not reasonably practicable for the Partnership to determine fairly the value of its net assets;

(c)    None of the requests for withdrawals which have been made may be lawfully satisfied by the Partnership in U.S. dollars; or

(d)    There is a breakdown in the means of communication normally employed in determining the prices of a substantial part of the investments of the Partnership.

## ARTICLE IX

## Term and Dissolution of the Partnership

Section 9.01    Term of the Partnership. The Partnership will continue from year to year unless dissolved as hereinafter provided.

EXHIBIT C

Section 9.02   <u>Dissolution of the Partnership</u>.   The General Partner may dissolve the Partnership at any time, and thereupon it will wind up the Partnership's affairs.  If the General Partner withdraws, becomes bankrupt or insolvent, or dissolves, the Partnership will dissolve unless (i) at such time there is another general partner who agrees to continue the business of the Partnership or (ii) an entity controlled by John J. Bartoletta is substituted as general partner to continue the business of the Partnership.  If there is no remaining general partner who agrees to continue the business of the Partnership, or an entity controlled by John J. Bartoletta is not substituted as general partner, the Partnership will dissolve and thereupon be wound up as described in Section 9.03 (i) by the General Partner, or (ii) if the General Partner is unavailable, by the person or persons previously designated by the General Partner, or (iii) if the General Partner has made no such designation, by the person selected by a majority in interest of the Capital Accounts of all the Limited Partners as of the date of dissolution. Such person shall take all steps necessary or appropriate to wind up the affairs of the Partnership as promptly as practicable thereafter.  Such person, including the General Partner in this role, is hereinafter referred to in this Section 9.02 as the "Liquidator."  Neither the admission of Partners nor the retirement, bankruptcy, death, dissolution, legal incapacity or disability of a Limited Partner will dissolve the Partnership.

Section 9.03   <u>Procedure on Winding Up</u>.

(a)   Upon the winding up of the Partnership, a full account of the assets and liabilities of the Partnership will be taken and the assets of the Partnership will be liquidated to the extent determined by the Liquidator and, as promptly as practicable, the assets or cash proceeds thereof will be applied in the following order of priority:

(i)   To the payment of all debts to non-Partners, taxes, obligations and liabilities of the Partnership including the expenses of liquidation and compensation paid to the Liquidator;

(ii)   To the payment of all debts to Partners; and

(iii)   To the payment to Partners of their remaining Capital Accounts in proportion to the amounts thereof.

(b)   In the winding up of the Partnership, the Liquidator may establish reserves for contingent liabilities of the Partnership in an amount (including estimated expenses, if any, in connection therewith) determined by the Liquidator and, upon the satisfaction of such contingent liabilities, the amounts, if any, remaining in such reserves shall be distributed as provided in subparagraph (a)(iii) of this Section 9.03.

(c)   Distributions to a Partner pursuant to subsection (a)(iii) above may be in installments and shall be made in cash or, in the discretion of the Liquidator, in investments selected by the Liquidator, or partly in cash and partly in investments selected by the Liquidator.

(d)   Upon the winding up of the Partnership, the name of the Partnership and its goodwill shall not be appraised, sold or otherwise liquidated but shall remain the exclusive property of the General Partner.

(e)   Within 90 days after the completion of the winding up of the Partnership, the Liquidator shall cause to be prepared and forwarded to each Partner a final statement and report of the Partnership, prepared in accordance with Section 11.05.

## ARTICLE X

### Payments to and by a Person
### Who Has Ceased to be a Partner

Section 10.01   Payments on Retirement, Death, Bankruptcy, or Legal Incapacity of any Partner. Within 30 days after (a) the date of retirement of a Partner hereunder or (b) in the discretion of the General Partner, the last day of the fiscal year during which a Partner died, became bankrupt or legally incapacitated there will be paid or distributed to such Partner or to the legal representative of such Partner, an amount in cash or, in the sole discretion of the General Partner, in investments or partly in cash and partly in investments selected by the General Partner, equal in value to not less than 90% of the estimated amount of the Liquidating Share (as hereinafter defined) of such Partner. Promptly after the General Partner has made a final determination of the value of the Capital Accounts of all the Partners as of such date (which, in the General Partner's sole discretion, may be after the Partnership's auditors have completed their examination thereof required by Section 11.04), the Partnership will pay to such Partner or its representative, in cash and/or investments selected by the General Partner, the amount of the excess, if any, of the Liquidating Share of such Partner over the amount so paid, or such Partner or representative will return and pay to the Partnership in cash the amount of the excess, if any, of the amount so paid over such Liquidating Share, in each case together with interest thereon, to the extent permitted by applicable law, from the applicable date referred to in clauses (a) and (b) above to the date of the payment at an annual rate equal to the rate in effect at the Partnership's prime broker on such applicable date.   The term "Liquidating Share," when used with respect to any retiring, deceased, bankrupt, legally incapacitated or disabled Partner, will mean the Capital Account of such Partner on the date in question.

Section 10.02   Reserve for Liabilities.   The right of any retired, deceased, bankrupt, legally incapacitated or disabled Partner (or their legal representative) to have distributed the Liquidating Share of such Partner will in all instances be subject to retention by the Partnership of a reserve, in such amount as the General Partner will determine, in its sole discretion, for Partnership liabilities and contingencies. Upon the General Partner's determination that such reserve (or portion thereof) is no longer required, there will be distributed to such Partner his proportionate share of the reserve which is no longer required together with interest thereon at an annual rate equal to the rate in effect at the Partnership's prime broker at such time.

## ARTICLE XI

### Miscellaneous Provisions

Section 11.01   Withholding Taxes.   The Partnership shall withhold any taxes, fees or other charges the Partnership is required to withhold under applicable law with respect to any Partner (and paid to the appropriate governmental authorities) and will deduct the same from the Capital Account of such Partner as of the last day of the Fiscal Period or fiscal year with respect to which such amount the Partnership is required to withhold.

Section 11.02   Designation of Attorney. Each of the undersigned for himself hereby irrevocably constitutes and appoints the General Partner as his true and lawful attorney in his name, place and stead, to make, execute, sign and file:

(a)   The Certificate of Limited Partnership and any amendment thereto or termination thereof which is or may be required by the laws of the State of Delaware;

(b)   Any certificate required by reason of the dissolution of the Partnership; and

      (c)    Any application, certificate, report or similar instrument or document required to be submitted by or on behalf of the Partnership to any governmental or administrative agency or body, to any securities exchange, board of trade, clearing corporation or association or to any self-regulatory organization or trade association.

Said attorney is not by this Section 11.02 granted any authority on behalf of the undersigned to amend this Agreement.

Section 11.03   <u>Maintaining Books of Account</u>.  The General Partner shall keep proper and complete books of account of the Partnership at all times and Limited Partners or their accredited representative will be able to inspect such books of account at reasonable times during office hours.

Section 11.04  <u>Audit of Books</u>. The General Partner shall designate auditors from time to time that will audit the books of account and records of the Partnership at the end of each fiscal year.

Section 11.05  <u>Reports to Partners</u>.  The General Partner shall furnish to the Limited Partners unaudited reports of the performance of the Partnership promptly after the end of each calendar quarter, and audited financial statements of the performance of the Partnership, including a statement of profit and loss, prepared by the Partnership's auditors, promptly after the end of each fiscal year (using GAAP as a guideline). In addition, as promptly as practicable after the end of each fiscal year, the General Partner will send each Limited Partner a report indicating the amounts representing their respective share of net long-term capital gain or loss, net short-term capital gain or loss and investment/operating profit or loss, for purposes of reporting such amounts for Federal income tax purposes.

Section 11.06  <u>Amendment of the Agreement</u>. The General Partner may amend this Agreement in its sole discretion in any manner that does not materially adversely affect any Limited Partner or to effect any changes required by applicable laws or regulations. This Agreement may also be amended by action taken by both the General Partner and the Limited Partners owning a majority in interest of the Capital Accounts of all of the Limited Partners at the time of the amendment, provided that such amendment does not discriminate among the Limited Partners.

Section 11.07  <u>Non-Voting Interests</u>.  Upon written notice to the General Partner, any Limited Partner may waive its voting rights with respect to all or a portion of its limited partnership interest. A Limited Partner who has waived its voting rights shall not be entitled to exercise any right to consent to actions to be taken with respect to the Partnership, including the approval of any amendments to this Agreement or any right conferred by Delaware law. For purposes of determining the requisite percentage of Capital Accounts to approve amendments or actions of Limited Partners under this Agreement, the Capital Accounts of Limited Partners that have waived their voting rights shall be disregarded.

Section 11.08  <u>Notices</u>. All notices provided for under this Agreement will be in writing and will be deemed to have been duly given as indicated if sent to the Partner's address as set forth in the schedule in the files of the Partnership as of the date of such notice:

        (i)    If delivered in person or by courier, on the date it is delivered;

        (ii)    If sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted;

        (iii)   If sent by first-class mail, two days after the date of postmark;

        (iv)   If sent by facsimile, on generation of confirmation; and

EXHIBIT C

(v)    If sent by electronic mail, upon receipt (by way of clarification, whether or not opened).

Notice by any Limited Partner to the Partnership will be deemed effective upon receipt by the Partnership.

A Partner may change his or its address for purposes of this Agreement upon 5 days' prior written notice to the General Partner.

Section 11.09   <u>Binding Effect of Agreement</u>. This Agreement, including Section 11.02 hereof, will be binding on the successors, assigns and the legal representatives of each of the Partners.

Section 11.10   <u>Counterparts</u>. This Agreement may be executed in more than one counterpart with the same effect as if the Partners executing the several counterparts had all executed one document.

EXHIBIT C

## SIGNATURE PAGE

IN WITNESS WHEREOF, the undersigned have hereunto signed this LIMITED PARTNERSHIP AGREEMENT as of the date first written above.

**GENERAL PARTNER**

High Street Capital Management, LLC
By: High Street Group, L.L.C.
    Managing Member

**By:** _____

Date of Signature: _3_ / _2 6_ / _0 9_

**LIMITED PARTNER**

_Eva M. Hemenway_
Print Name of Limited Partner

**X** _Eva M Hemenway_
Signature of Limited Partner or Authorized Signatory

_____
Title of Authorized Signatory

Date of Signature: _3_ / _2 H_ / _0 9_

**X** _____
Signature (Secondary if needed)

Date of Signature: _____ / _____ / _____

## GENERAL PARTNER ACCEPTANCE

ON BEHALF of New Advantage Futures, L.P., the undersigned hereby accepts this executed LIMITED PARTNERSHIP AGREEMENT.

**GENERAL PARTNER**

High Street Capital Management, LLC
By: High Street Group, L.L.C.
    Managing Member

By: _____

Date of Signature: ____3___ / __24__ / __09__

March 24, 2010

HighStreet Group
12802 Tampa Oaks Blvd.
Suite 405
Tampa, Florida 33637

Re: Jason M. Hemenway
    Reference No. ████████2001

To Whom It May Concern:

Enclosed please find transfer paperwork to move the above referenced account from HighStreet Group to Capital City Trust Company. I would appreciate it if you would comply with the enclosed instructions immediately, so that all liquidation deadlines are met as of today.

Sincerely,

Jason M. Hemenway

Jason M. Hemenway

# EXHIBIT D

March 24, 2010

HighStreet Group
12802 Tampa Oaks Blvd.
Suite 405
Tampa, Florida 33637

Re: Eva M. Hemenway
    Reference No. ████████7001

To Whom It May Concern:

Enclosed please find transfer paperwork to move the above referenced account from HighStreet Group to Capital City Trust Company. I would appreciate it if you would comply with the enclosed instructions _immediately,_ so that all liquidation deadlines are met as of today.

Sincerely,

Eva M. Hemenway

_Eva M Hemenway_

# EXHIBIT D